HENRY M. LOUD v. CHARLES WINCHESTER, GEORGE E.
WASEY, AARON F. GAY, HERBERT F. WHITING AND
HENRY N. LOUD.

*Trust to secure payment—Right of beneficiaries to information—Personal
benefits— Waiver—Supplementary orders.*

1. The transfer by a debtor to a creditor of the title, possession and con-
trol of the debtor's property, whereby the transferee receives advant-
ages in the exclusion of other creditors, furnishes a valuable con-
sideration for the reduction of the debt and the release of personal
liability.

2. Beneficiaries under a trust have the right at all times to be kept in-
formed by the trustees as to its management.

3. Under a bill for an accounting by trustees any testimony that throws
light on their management of the trust bears directly on the per-
formance of their duty to keep the beneficiaries informed; and
proof of misconduct and misappropriation by them is admissible
whether anticipated and charged in the bill or not.

4. Strict performance of trust duties may be waived; but such waiver
in the past and in the case of completed transactions will not justify
or excuse subsequent laxity that has not been authorized or ap-
proved.

5. A discretion confided to trustees jointly cannot be independently ex-
ercised by one of them so as to ignore another even with the consent
of others who, with him, would constitute a majority.

6. Trustees must not receive from their employment personal benefits
that are not provided for in the trust; as *e. g.* by receiving special
compensation for supervising transactions connected with the busi-
ness confided to them, but unauthorized by the trust.

7. Where a case remains in court upon equities reserved and for future
supervision, orders subsequent to the decree can be made as circum-
stances require.

8. An insolvent firm made an absolute warranty deed of its business and
other property to its principal creditor. The latter conveyed it in
trust to certain persons to be managed for his sole benefit, and em-
powered them to carry on the business, buy property, borrow
money, sell lands and personalty and exercise other powers not in-
herent in mortgage relations. But at the same time the creditor
and the trustees together executed a declaration of trust in favor of
the firm, whereby, after the trust should be satisfied, the remainder

of the property was to be conveyed to it. *Held* that as between these parties this arrangement established a trust, and not merely a mortgage, relation, and that it placed the creditor under fiduciary obligations to the debtor.

Appeal from Iosco. (Tuttle, J.) Oct. 31.—Dec. 20.

BILL to enforce trust. Complainant and defendant Winchester appeal. Decree modified.

*D. C. Holbrook* and *Hanchett & Stark*, for complainant, cited, to show that the transactions in question established a trust, 1 Perry on Trusts §§ 82, 83; *Diefendorf v. Spraker* 10 N. Y. 246; *Scituate v. Hanover* 16 Pick. 222; *Lyle v. Burke* 40 Mich. 499; 2 Comp. L. 1871 § 4124 subd 5; *Wilkins v. Fitzhugh* 48 Mich. 81; *Ellis v. Secor*, 31 Mich. 190; trusts may be created under the statute by a letter, memorandum or recital, signed by the party creating the trust, or trustee; *Bates v. Hurd* 65 Me. 180; *Barrell v. Joy* 16 Mass. 220; *Moore v. Pickett* 62 Ill. 158; *Bragg v. Poulk* 42 Me. 502; 1 Perry on Trusts §§ 78 to 80, 81; the court of chancery has power to enforce the execution of a trust by declaring what it is and decreeing what acts are to be done by the trustee and restraining acts that ought not to be done : 2 Perry on Trusts § 816; *McCartney v. Bostwick* 32 N. Y. 60; *Coates v. Woodworth* 13 Ill. 659; *Marshall v. Caldwell* 125 Mass. 435; *Lasley v. Lasley* 1 Duv. 117; *Callis v. Ridout* 7 Gil. & J. 1; *Stone v. Hackett* 12 Gray 227; and where the instruments creating a trust contain no provision for its revocation, a party who joined in creating the trust cannot revoke it; *Fellow's Appeal* (Penn.) 9 Rep. 124; 1 Perry on Trusts § 104; the court has full power to remove any of the trustees when from improper conduct in the management of the trust he appears not to be a suitable person to execute the trust, and protect the interests of the cestuis que trustent ; 2 Comp L. 1871 § 4139; 1 Perry on Trusts §§ 275, 276; 2 Story Eq. J. §§ 1287, 1288, 1289; *Deen v. Cozzens* 7 Robert. 189; *Scott v. Rand* 118 Mass. 217; *Atty. Gen. v. Garrison* 101 Mass. 238; *People v. Norton* 9 N. Y. 178; *McPherson v. Cox*

96 U. S. 419; *In Re Morgan* 63 Barb. 622; *Quackenboss v. Southwick* 41 N. Y. 122; *Deraismes v. Dunham.* 22 Hun 86; Kerr on Receivers 20, 22; *Brown v. Vandermeulen* 41 Mich. 418; *Preston v. Wilcox* 38 Mich 578.

*Cutcheon, Crane & Stellwagen* for defendants, cited, to show that the arrangement between the parties was a mortgage: *Taylor v. Cornelius* 60 Penn. St. 187; *Locking v. Parker* L. R. 8 Ch. App. 30; *Parsell v. Thayer* 39 Mich. 467; *State Bank v. Chapelle* 40 Mich. 447; *Curtiss v. Sheldon* 47 Mich. 262; a bill to redeem is the mortgager's only remedy against the mortgagee: *Goldsmith v. Osborne* 1 Edw. 560; *Locking v. Parker* L. R. 8 Ch. App. 30; *White v. Lucas* 46 Iowa 319; one cannot file a bill for the sole purpose of having the instrument declared a mortgage: *Micou v. Ashurst* (1876) 55 Ala. 607; when a mortgager makes a mortgagee a party to a bill praying relief, it is the same thing as praying to redeem: *Cholmley v. Countess of Oxford* (1741) 2 Atk. 267; *Flanders v. Chamberlain* (1872) 24 Mich. 305; *Goodenow v. Curtis* (1876) 33 Mich. 505; one cannot redeem except upon the payment of the whole mortgage debt: *Johnson v. Harmon* 19 Iowa 56; *Knowles v. Rablin* 20 Iowa 101; *Collins v. Riggs* 14 Wall. 491; *Martin v. Fridley* 23 Minn. 13; an executory agreement to take part of an admitted debt in satisfaction of the whole is nudum pactum: *Pinnel's case* (1602) 5 Co. 117; *Cumber v. Wane* (1716) 1 Strange 426; *Heathcote v. Crookshanks* (1787) 2 Term 24; *Lynn v. Bruce* (1797) 2 H. Bl. 317; *Seymour v. Minturn* (1819) 17 Johns. 169; *Warren v. Skinner* 20 Conn. 559; *Molyneaux v. Collier* 13 Ga. 406; *Rose v. Daniels* 8 R. I. 381; *Ryan v. Ward* 48 N. Y. 204; *Bryan v. Foy* 69 N. C. 45; *Mitchell v. Sawyer* 71 N. C. 70; *Hayes v. Davidson* 70 N. C. 573; *Line v. Nelson* 38 N. J. L. 358; *Wharton v. Anderson* 28 Minn. 301; *Perkins v. Lockwood* 100 Mass. 249; *Clifton v. Litchfield* 106 Mass. 34; *Blake v. Blake* 110 Mass. 202; part payment of an admitted debt will not support an agreement to release the whole debt: *Fitch v. Sutton* (1804) 5 East 230; *Har-*

*rison v. Close* (1807) 2 Johns. 448; *Mechanics' Bank v. Hazard* (1816) 13 Johns. 353; *Blanchard v. Noyes* (1826) 3 N. H. 518; *Wheeler v. Wheeler* (1839) 11 Vt. 60; *Down v. Hatcher* (1839) 10 Ad. & El. 121; *McKenzie v. Culbreth* 66 N. C. 534; *Rea v. Owens* 37 Iowa 262; *Bryan v. Brazil* 52 Iowa 350; an agreement for the reduction of a debt without consideration will not be specifically enforced: *Minturn v. Seymour* (1820) 4 Johns. Ch. 498; *Moore v. Hylton* (1830) 1 Dev. Eq. 429; *Acker v. Phœnix* (1834) 4 Paige 305; *Tufnell v. Constable* (1836) 8 Sim. 69; *Gurley v. Hiteshue* (1847) 5 Gill 217; *Norris v. Slaughter* (1851) 3 Greene 116; *Watts v. Frenche* 19 N. J. Eq. 407; *Simmons v. Clark* 56 Ill. 96; *Bunge v. Koop* 48 N. Y. 225; *Smith v. Tyler* 51 Ind. 512; an agreement to extend the time for the payment of a debt needs a consideration to support it: *Kanady v. Burk* 18 Mich. 291; a stipulation in the mortgage, that on default, the mortgagee shall be entitled to the rents, issues and profits of the mortgaged premises will not be enforced: *Hazeltine v. Granger* 44 Mich. 503; a mortgagee in possession is not bound to engage in adventure and speculation for the benefit of the mortgager: *Hughes v. Williams* (1806) 12 Ves. 493; a defendant mortgagee in possession, is not bound to account except on a bill to redeem: *Chapman v. Smith* (1837) 9 Vt. 153; *Portland Bank v. Fox* (1841) 19 Me. 99; *Weeks v. Thomas* (1842) 21 Me. 465; *Seaver v. Durant* 39 Vt. 103; *Onderdonk v. Gray* 19 N. J. Eq. 65; *Hubbell v. Moulson* 53 N. Y. 225; *Toomer v. Randolph* 60 Ala. 356; *Cockburn v. Edwards* L. R. 18 Ch. Div. 449; nor to render annual accounts: *Lord Trimleston v. Hamill* (1810) 1 Ball & B. 377.

CAMPBELL, J. The object of the bill in this case is to protect complainant's interest as beneficiary under a trust covering timbered lands and other lumbering property and business connected with it, on the ground of denial of his rights and various acts detrimental to the objects of the trust. Relief was granted to the extent of declaring the trust and ordering an accounting, as well as fixing salaries and regulating some matters of administration, reserving

further equities. Complainant appeals because the decree does not go far enough in some directions, and Winchester appeals generally. The other parties do not appeal. The case involves the existence and character of the trust, and various complaints of disregard and mismanagement. As some questions are raised concerning the consideration of the arrangement, and the reduction of Winchester's debt which the property was designed to secure, a brief reference is necessary to the transactions out of which the dealings grew.

For some ten years before January, 1877, complainant had been doing business with different parties in lumbering and salt making, and in carrying on a store connected with his other business in Oscoda, in the county of Iosco. Defendant Gay had always been one of the partners. Winchester had been at one time a general, and at one time a special partner, but had left this relation some time before, and was a very large creditor to an amount, as claimed, of about $440,000. At this time complainant and Gay were the only partners, and they owed other debts of about $225,000 and taxes between nine and ten thousand dollars. The property consisted chiefly of timbered lands, mills, salt blocks, lumber and vessels, and a stock of goods at Oscoda. The land titles were in different shapes and in different names and were partially encumbered to Winchester and others.

In the latter part of 1876 Winchester obtained titles or securities on more or less of the property, and there was reason to expect proceedings of other creditors to get pay for their debts. Some negotiations were had with Winchester, which resulted in a set of conveyances and other instruments to provide for the payment out of the property of Winchester's claim, which he agreed to reduce to $275,000 and to secure the balance of the property for the benefit of Loud & Gay. To this end Loud & Gay made an absolute warranty deed of their property wherever situated in Michigan, and Winchester executed a conveyance of most of it, as described and designated, in trust to George E.

Wasey, Herbert F. Whiting and Henry N. Loud (a son of complainant), to be managed and disposed of for purposes on its face designed for Winchester's own benefit entirely. He and the trustees at the same time executed a declaration of trust in favor of Loud & Gay, after his own debt should be paid. A further paper of similar character related to certain lands not covered by the other instruments. These papers were all part of one transaction, and dated January 1, 1877.

The first paper needing attention is the deed from Winchester to the trustees. This was not a conveyance in fee, but ran to the grantees, their successors and assigns for ten years, and no longer. They took it in trust for these purposes:

*First.* To take possession of their property and carry on therewith " a general lumber and salt business at Oscoda, Michigan," and purchase such other "personal property as may be necessary therefor,"—to make all needful repairs to mills, salt blocks and other property, insure and pay taxes, employ all necessary assistants and agents to carry on the business, to stock and carry on the store in connection with said business, " and to mortgage any portion of said property for the purpose of raising money with which to carry on and conduct said business."

*Second.* To sell any and all of the property, real or personal, at any time they may deem best for Winchester's interest at public or private sale, but no real estate to be sold without written consent of Winchester, or his representatives or assigns. All property purchased was to be subject to the trust.

*Third.* The proceeds of business and sale of any property but realty were to be applied *first*, to taxes, insurance and business expenses or expenses of sales; *second*, to buy up any liens of third parties deemed best for Winchester's protection and benefit; *third*, to pay proceeds of all real estate directly to Winchester, and to pay him, his heirs, executors, administrators or assigns the remainder of receipts, profits and proceeds.

*Fourth.* They were to make annual statements, and Winchester reserved the right of nominating, if he chose, persons to act as their agents to assist in carrying on the business.

*Fifth.* At the end of ten years everything was to be turned over to Winchester.

It is manifest that if Winchester owned this property absolutely or had any other interest in it, this so-called trust being entirely for his own benefit, would, if standing alone, be nothing more than a power of attorney coupled with no interest and at all times revocable. It is further manifest that it contains powers which, if his interest was as a mortgagee, could not lawfully be granted without the concurrence of the owners of the equity of redemption.

But the declaration or provision in favor of Loud & Gay, made as part of the same transaction, indicates the true character of this arrangement. That instrument is executed by Winchester and the three trustees, and is of the following purport:

It recites the execution of the other conveyance, and that Winchester owns other timbered lands in Michigan. It then declares that the amount to be paid in all to Winchester is $275,000, with interest at the rate of 5 per cent., payable as follows: $25,000 during the first year (1877); $35,000 in each of the second and third years (1878 and 1879); $30,000 in each of the fourth and fifth years (1879, 1880), and $40,000 a year thereafter, till the principal and interest should be fully paid. But in case of Winchester's death before full payment, the whole interest should be remitted and only the $275,000 principal paid. All surplus moneys beyond the specified sums in any year were to be used in the discretion of the trustees in buying up claims against Loud, Gay & Co., or paid over to Winchester. The trustees could, until forbidden, cut not more than 15,000,-000 feet a year of logs from other lands of Winchester, who also reserved the right not only to revoke this right to cut other timber, but also to require interest to be paid, notwithstanding his death.

The property remaining was to be conveyed to Loud & Gay after the trust was satisfied, but they were to take no interest before. A similar declaration was made concerning some other lands not conveyed to the trustees.

There was an unwritten understanding that Loud & Gay should continue to manage the business as before, and that Wasey and his co-trustee, Henry N. Loud, should be the acting trustees, and Wasey be the financial manager or agent. Whiting was not expected to do active duty. The business was carried on with these several persons acting in these capacities until some time in 1880, when complainant was removed from the management, and Gay continued on a double salary of $6000, besides compensation for management of business of the Oscoda Boom Company. The trust business was carried on under the name of the Oscoda Salt and Lumber Company, and contracts were made in that name. Some of complainant's sons were employed in the business.

In 1880, on the return of complainant from the south, where he had wintered, he found fault with Wasey's management, and had some correspondence with Winchester on the subject, who informed Wasey of what had been written. The result of this difficulty was ultimately the removal of complainant, before referred to, and an attempt by Winchester to repudiate the trust as terminated by non-payment of the sums provided for. After this Wasey refused to recognize complainant's rights, and to a certain extent, and as to any interest in complainant, denied the authority of his co-trustee, Henry N. Loud.

Only a small part of the annual sums mentioned was paid to Winchester, and complaint is made that, instead of devoting money to this purpose, large outlays were made, with Winchester's consent, for other purposes. Among these, as alleged, were the purchase of $30,000 worth of pine lands, the rebuilding of a burned mill and salt blocks, and the failure to apply large accumulations of personal property to pay Winchester. Complaint is further made that the books are not so kept as to exhibit the true state of the business;

that Gay and Wasey manage correspondence in their personal names, and refuse information, and refuse to recognize complainant's rights, and act merely for Winchester, and draw such salaries as they choose ; and that while Whiting is absent and takes no part, Henry N. Loud, who is the only trustee practically acquainted with the business, is thwarted and ignored, and the policy of economical management and payment of the debt subordinated to extravagance and expansion of business.   These parties are also charged with lending the credit of the concern, and keeping it from the books and from complainant's knowledge, and with keeping a book-keeper who is impudent and acts in disregard of Henry N. Loud's rights of inspection of books, and who does not make proper entries.   It is charged that the purpose is to let the debt accumulate and prevent complainant from getting any results out of the property.

The first thing to be looked at is the nature of this arrangement and its consideration.   It is claimed by defendant Winchester that he is merely a mortgagee in possession, and that not only must this be treated as a bill to redeem, but the reduction of the debt was without consideration, and the whole is due.

As no other creditors are before the court, we are only interested in regarding the mutual interests of the parties between whom this contest arises.   And we think that, although this arrangement was made to secure a debt, it very clearly involves trust powers which are in no way inherent in mortgage relations.   It contemplates the management of an extensive business, the purchase of property, the borrowing of money, the sale of lands and personalty, and some other powers and action of peculiar character. The combined action of Winchester and the trustees devotes the entire estate to a species of management very plainly fiduciary, and the action of Loud & Gay in putting the whole legal title where this arrangement covers it, and their assent to it, complete the trust relation.   The transfer of title and possession, and the relinquishment of control in

the manner provided, whereby Winchester not only secured for himself and the trustees immediate possession but important rights of management, furnished a valuable consideration for the arrangement whereby the debt was reduced and personal liability released. He received advantages over the other creditors, who might have levied on the lands if merely mortgaged, and might have secured a standing by purchasing the equity of redemption, and thereby possessory rights until foreclosure as well as the right of inquiring into the nature and extent of Winchester's bona fide claims. As between these parties, we can see no ground for holding defendants exempt from the obligations attaching to the fiduciary relations relied on.

In this view the question how far the trust has been abused, and how far it can be complained of after the actual dealings of the parties, becomes the main subject of controversy. But there is, perhaps, a preliminary inquiry concerning the breadth of the issues. It is claimed by the defense that all proof of misconduct and misappropriation of the trustees, not anticipated and charged in the bill, is immaterial and must be thrown out. This, we think, is not so. The beneficiaries under a trust have the right to be kept informed at all times concerning the management of the trust, and it is the duty of the trustees to so inform them. It is not generally presumable that the beneficiaries have such information from independent sources. When, therefore, a bill is filed to call trustees to an account, any testimony throwing light on their management bears directly on the performance of this duty, and may be considered in taking the accounts and in determining the view to be taken of the conduct of the trustees.

It is also claimed by the defense, and with justice, that a beneficiary cannot blame a trustee for action which he has himself approved or suggested beforehand, with knowledge of the condition of affairs. There is no doubt that parties may waive the strict performance of trust duties. But while this is so, in regard to completed transactions, it is equally clear that the beneficiary may require future deal-

ings to conform to the trust, and that past laxity will be no excuse or justification for future laxity which has not been authorized or approved.

With this preliminary statement it becomes necessary to look at what the trust contemplated and required. Its entire scope includes no more than the duty of conducting and continuing an existing local business at Oscoda, including the management of mills and salt blocks run in connection, and the management of a store, also in connection with the same business. The cutting of timber to supply the mills, and perhaps the purchase of logs for the same purpose, and such collateral arrangements as usually belong to such a local lumbering business, may also, perhaps, be included. Power was given to borrow money, if necessary, on mortgage. The whole purpose of the trust was to manage the property to raise money to pay off obligations. It did not contemplate the enlargement of business for any other purpose, nor its establishment elsewhere, and it did not contemplate the creation of further obligations not necessary in the business itself, or for repairs.

It further expressly appropriated the whole income, and required it all to be expended in the extinction of existing liabilities. No room was left for accumulation or enlargement. And the necessity of such an appropriation is obvious. If the property was to be retained and accumulated, and the debts left to accumulate also, the risk of destruction by fire or casualties and the risk of depreciations and business straits, might lead to an entire sacrifice, when, if the debts were continually cut down, the ultimate prospects would be very different, and the chances of saving a surplus would be much greater.

As we have no full rendering of accounts on the record, it cannot yet be determined to what extent complainant is estopped by what took place before the winter of 1879–1880. It does not appear thus far that the course of the trustees, in their diversion of the income from its proper uses, was not assented to. When the accounts come in it is possible this may be changed. But for our present pur-

poses no complaint seems clearly tenable before the return of complainant from Florida, although there is much to criticise as improper if not assented to.

The facts show that under the management as conducted, instead of keeping the business within its ordinary course and paying off the debts as far as possible, very little attention was paid to this ; and although the results have been large, the payments have been in no proper proportion to them. It also appears that instead of confining himself to such financial management as was contemplated he should assume, of a business the ordinary matters of which were to be conducted by local superintendence, Wasey has absorbed a very large and general management, practically independent in many respects of his co-trustees, and has not dealt with his co-trustee Henry N. Loud civilly or according to his legal duty, but has ignored him to a considerable extent, and has encouraged the book-keeper to do so. He also disregarded well-founded charges of irregularity in the book-keeping. Under this trust, as written, and as the parties had a right to deal with it, the three trustees all stood on the same footing, and were all equally entitled and bound to act. The only arrangement made whereby a majority could act independently, was as to Wasey and Henry N. Loud. No such arrangement was ever made as to Wasey and Whiting which would justify ignoring Loud. Still less could Wasey use his own judgment alone, either with or without the consent of Whiting, as it is obvious he has done to a considerable extent. Whatever purely executive business his co-trustees might have entrusted to him, any business calling for the discretion of the trustees officially could not be thus assumed or allowed.

The business with Monroe & Co., at Cleveland, does not appear to have been agreed upon by the trustees, and seems to be a very remarkable outgrowth of a trust which was to be conducted at Oscoda. By this arrangement a large proportion of the lumber produced, on which a balance of over $180,000 was unpaid at one time, was kept shipped to a firm at Cleveland entirely on credit, and subject to be sold

out by that firm with no security but such as would come from a lien on the leasehold premises and improvements, and on the contents of the yard, which were intended for sale under a reserved power of supervision, which would have been of but moderate use in case of misconduct. The yard was not an agency, and the trust authorized no such agency. The fact that Wasey was paid for his own personal supervision of this Cleveland business was of itself in violation of the general doctrine which prevents personal benefits to trustees from their employment, and this doctrine was recognized in the decree which compelled him to account for it. But this substantial transfer of so large a part of the business from Oscoda in a body into another state, and the agreement for continuing this large credit business for lumber, can hardly be harmonized with the trust purposes.

The only explanation that can be found is in the policy evidently and plainly asserted that Winchester had become by his repudiation of the trust entitled to be regarded as mortgagee in possession, and the trustees as his trustees. This doctrine is not tenable. He had at all times power to require the employment of new managers, and to compel the trustees to live up to the trust. Instead of this he seems to have acquiesced in the action had before he attempted in 1880 to repudiate the trust, and since that time Wasey has done his individual bidding or obtained his acquiescence, and neither has respected any other rights as they should have been respected.

It appears affirmatively that in 1880 complainant urged strongly the application on Winchester's debt of all the unnecessary accumulations, but Winchester did not consent but undertook to get rid of the trust altogether, and is responsible personally, chiefly, if not entirely, for the subsequent policy. Upon the examination of witnesses to prove the value of Wasey's services, a main ground of commendation propounded was the large accumulation of assets under the trust, amounting in all to $404,065.22, and leaving, after deducting payments to Winchester and debts to

Loud, Gay & Co., a clear balance of $288,682.73. This amount is claimed by defendants to be correct, and if so, it is, so far as we can judge, sufficient to wipe out all or nearly all of Winchester's claim. It ought to have been so applied as far and as fast as possible. It may possibly be over-stated. The accounting will probably show, and the decree should in respect to this be modified somewhat.

Another important question is whether for these viola-tions of trust Wasey should be removed. If we were satis-fied that complainant's rights were endangered, it would be necessary to do so. But while we are satisfied the duties have not been performed with proper regard to mutual rights, it is not clear that much of this conduct has not been had under a legal misconception, and it is further clear that Winchester is responsible personally, and that probably the interests of complainant can be preserved in the accounting. By Wasey's removal the trust would remain in Loud and Whiting, and there are strong reasons why the discretion-ary powers should not be so transferred while all the trus-tees are living. No new trustee could be well selected in Wasey's place without confusion, if such an appointment should be found otherwise proper. The only other alter-native would be a receiver. But if it should turn out on accounting that the trust has not substantially fulfilled its object, there are objections to any needless employment of a receiver to exercise such powers as the continuance of such a business would entail, which should make it a last resort.

As all the equities not now dealt with can be disposed of after the accounting, we are not disposed to disturb the official standing of the trustees, preferring now to assume that with an understanding of their duties they will here-after act harmoniously and in a business-like way in accord-ance with their strict duties.

We see no reason for disturbing the decree for costs, and for the present, at least, we are not disposed to interfere with the salary arrangement, except as to the non-resident trustee. The record shows no reason for giving him an an-

nual salary of the same amount as the rest.  He may very likely be entitled to some pay for services, but it may better be determined hereafter.

We are also of opinion that the decree should require the application without delay of all available personal property on hand towards the payment of the debt of Winchester, and that hereafter all available proceeds of the business be similarly applied as fast as realized in the same way, although they may exceed the $40,000 yearly referred to in the decree as it stands.

As the case must remain in court upon the equities reserved, and for future supervision, any further orders can be made hereafter as circumstances require.  The propriety of some outlays complained of will depend somewhat on the accounting.

The decree will be modified accordingly, and complainant will be entitled to costs against Winchester.  The record to be remanded for further proceedings.

The other Justices concurred.