HENRY M. LOUD v. CHARLES WINCHESTER, GEORGE E. WASEY, ET AL.

64    23
f122   644

[See 52 Mich. 174.]

*Trusts—Bill for an accounting for maladministration—Rights and duties of trustees.*

1. In an action for an accounting by a trustee for the alleged maladministration of the trust, it is not *reasonable* to require the complainant to set out in his bill the *misdoings* which he could not be expected to *fully* understand until he had obtained *disclosures,*

the beneficiaries not being *generally* presumed to possess such knowledge from *independent* sources. In *such* a suit, *any* testimony throwing light on the trustee's *management* of the trust bears directly on the performance of *this* duty, and may be considered in taking the account and in determining the view to be taken of the conduct of the trustee.

2. Trustees have no right to assume *extraordinary* risks, but should do business on *business* principles, and not depart *radically* from the *purposes* of the trust reposed in them.

3. A man may *lawfully* run any risks he chooses with his *own* business, but a trustee has no *right* to use the trust to accommodate *other* parties, or to enter upon an extended course of bill discounting and indorsing with customers.

Appeal from Iosco. (Tuttle, J.)    Argued October 6 and 7, 1886.    Decided January 6, 1887.

Bill for an accounting by trustees. Defendants Winchester and Wasey appeal. Decree affirmed, except in particulars specified in opinion. The facts are stated in the opinion, and in former report of same case, found in 52 Mich. 174.

*D. C. Holbrook* (*Hanchett & Stark*, of counsel), for complainant:

The commissioner's report upon the facts found, properly within the scope of the reference, has the weight of a special verdict, and will not be set aside without clear proof of error or mistake in his findings: *Dean v. Emerson*, 102 Mass. 482; *Trow v. Berry*, 113 Id. 146; *Richards v. Todd*, 127 Id. 172; *Medsker v. Bonebrake*, 108 U. S. 72; *National Bank v. Sprague*, 23 N. J. Eq. 82, 83; *Graham v. Graham*, 21 West Va. 698.

In order to an accounting, the commissioner was required to pass upon all the items in the account allowed by him, although the charges arose during the pendency of the suit. The decree and order of reference also required it: *Tyler v. Willis*, 35 Barb. 213; *Harrison v. Mock*, 10 Ala. 196; *Burleigh v. White*, 70 Me. 136.

If any of the findings are outside of the direction to the commissioner, the court may act upon the report and the evidence upon those points for the purpose of making such decree as ought to be made, the report standing as an aid to the court: *McHenry v. Moore*, 5 Cal. 90; *Barnebee v. Beckley*, 43 Mich. 613.

A trustee is liable for the loss of the debt when the debtor is released: Perry, Tr. §§ 440, 828–848; *May v. LeClaire,* 11 Wall. 236.

*Cutcheon, Crane & Stellwagen,* for defendant Winchester:

Defendant is not answerable for breaches of trust not alleged in the bill: *Smith v. Smith,* 4 Johns. Ch. 281; *Holley v. S. G.,* 4 Edw. Ch. 284; *Sawyer v. Mills,* 20 Law J. Rep. (N. S.) Ch. 80; *Sleight v. Lawson,* 26 Id. 553; *Page v. Olcott,* 28 Vt. 465; *Dennis v. Dennis,* 15 Md. 73, 147; *Delevante v. Child,* 6 Jur. (N. S.) 118; *Massey v. Massey,* 2 Johns. & Hem. 728; Heard, Eq. Pl. 50, 51.

Under a decree for an ordinary accounting of what had been received by a trustee, no inquiry as to willful default being directed, nor such question reserved, the final decree cannot cover such charge: *Green v. Badley,* 7 Beav. 274; *Jones v. Morrall,* 2 Simons (N. S.). 241; *Lyne v. Lyne,* 8 DeG. M. & G. 553 ; Heard, Eq. Pl. 51.

Complainant, with full knowledge of all the facts, elected by his first decree to take all the personal property acquired by the trustees, with the gains, accumulations, and proceeds of the trust property and business, and he cannot repudiate his election, and charge the losses upon the Monroe Brothers & Co. account to them: *Lloyd v. Brewster,* 4 Paige, 537; *Morris v. Rexford,* 18 N. Y. 552; *Bank of Beloit v. Beale,* 34 Id. 473; *Moller v. Tuska,* 87 Id. 166; *Sloan v. Holcomb,* 29 Mich. 153; *Thompson v. Howard,* 31 Id. 309; *Nield v. Burton,* 49 Id. 53 ; *Rowley v. Towsley,* 53 Id. 329.

Complainant cannot take the entire profits, and charge entire losses to the trustees: *Heathcote v. Hulme,* 1 J. & W. 122; *Baker v. Disbrow,* 3 Red. 348; S. C. 18 Hun, 29; S. C. 79 N. Y. 631; *Rowley v. Towsley,* 53 Mich. 329.

Complainant concurred in establishing the Cleveland business, and is estopped from proceeding against the trustees or Winchester upon the claim that it constituted a breach of the trust: *Brice v. Stokes,* 11 Ves. 319; *Brewer v. Swirles,* 2 S. & G. 219; *Farrant v. Blanchford,* 1 DeG. J. & S. 107; *Jones v. Higgins,* 2 L. R. Eq. Cas. 538; *Campbell v. Miller,* 38 Ga. 304; *Poole v. Munday,* 103 Mass. 174; *Sherman v. Parish,* 53 N. Y. 483; *Loud v. Winchester,* 52 Mich. 174.

*George E. Wasey,* in *pro. per.*

CAMPBELL, C. J. This case was in this Court, and decided at the October term, 1883 (52 Mich. 174), upon a bill to establish the rights of the various parties under a trust including a lumbering estate managed in the name of the Oscoda Salt & Lumber Company. The controversy brought in for decision the conduct of the trustees, and of Winchester, the secured creditor, and was also intended to get relief for the alleged misconduct of Wasey and Winchester, and their associates or subordinates. A decree was made by the court below, substantially sustained by this Court, leaving the trust in the same hands, and ordering measures to close it up.

In pursuance of our decree the parties proceeded to an accounting, and upon most of the balances there is no complaint made. But various charges for losses were allowed against Winchester, and some also against Wasey, and certain of their respective claims were rejected. The cause is now before us on appeal, to obtain the disallowance of the sums alleged to be wrongly charged, and the allowance of what is claimed to have been wrongly rejected.

A preliminary series of objections is made, on behalf of Winchester, that there are no specific charges in the bill, and no provisions in the decree, which opened the door to an inquiry into the losses and other items charged against Winchester, who, it is said, is entitled, on the record, to his whole debt of $275,-000, less actual payments made in reduction of it, without regard to the cross or counter claims that are set up as arising from his legal misconduct; and it is also insisted that Winchester is not liable for conduct of others not actually engaged in or authorized by himself. Wasey's objections are chiefly based on his discretionary powers as trustee, which he insists protect him where there was no actual fraud.

In our opinion, there is not much in this record, so far as the disputed items are concerned, which has not already been settled by our former decision. It was plainly said there that, in an action like this, to call persons to an account for

the maladministration of a trust, it was not reasonable to require a complainant to set out in his bill the misdoings which he could not be expected to fully understand until he had obtained disclosures. It was there said:

"It is not generally presumable that the beneficiaries have such information from independent sources. When, therefore, a bill is filed to call trustees to an account, any testimony throwing light on their management bears directly on the performance of this duty, and may be considered in taking the accounts and in determining the view to be taken of the conduct of the trustees."

It was also our opinion that, after Winchester had attempted to repudiate complainant's rights, he and Wasey had been so connected in their dealings that he was individually responsible for their effect on the interests of the trust. Upon both these points we see no reason to change our former views. There has been no testimony taken which Winchester has not had the means of meeting as fully as if it had been foreshadowed in the pleadings. And the approval and acquiescence of Winchester in Wasey's view of his powers, and the almost complete actual approval of his specific acts, appear more fully now than before.

We shall not depart from our previous conclusions; and while there is, in some instances, a strong argument made to show that they do not cover some portions of the present dispute, we do not propose to change any results that depend upon them.

Before considering the separate items, some reference is proper to certain considerations of natural equity which were urged upon our attention.

We do not doubt, and are entirely convinced, that in the outset of these transactions Mr. Winchester had gone to further lengths than wisdom would warrant in giving accommodations to complainant and his associate, who had expanded their business under this encouragement until it became unmanageable, and would have swept away all their valuable

property had he not compromised and reduced his demand, and agreed upon this trust arrangement to work it out. Counsel are justified in claiming this was very liberal treatment. But it is quite manifest that the course which led to it was a very dangerous one for all parties; and, while it would not sound well for complainant to find fault with Winchester for humoring his schemes, the terms of the trust are inconsistent with the continuance of any such wild course in the future. And, whatever may have been complainant's moral debt of gratitude for the past, it in no way relieved Winchester and the trustees from doing business on business principles. Most of the present difficulty has been caused by a course of dealings which, as was pointed out in our former decision, departed radically from the purposes of the trust, and the testimony on the accounting indicates that nothing but a remarkable course of prosperity in the lumber interests has made it possible to work out a favorable issue from dealings that depended on too many contingencies to be safe in their nature. Winchester's death or failure would, at more than one time, have been disastrous to the trust in the shape in which these dealings put it. Trustees have no right to assume such risks; and had not Wasey dealt with the funds on the assumption that Winchester was the substantial beneficiary, and with his co-operation, the management might have been different. The result, as now shown, is favorable, and the residuary property is valuable, and no dishonest appropriation has appeared on the part of any one. How far this result would have followed from more timid or cautious management we cannot do more than conjecture; but it does not appear very plainly that the profits have exceeded what would have been realized from a similar property in ordinary hands.

The chief items charged to Mr. Winchester, and objected to, arose out of the transactions in Cleveland, known as the Monroe transactions.

It appears that in 1880, about the time when complainant was practically shut out from the business, a written contract was made between Monroe Brothers & Co. and Mr. Wasey, acting in the name of the Oscoda Salt & Lumber Company, which was the business name of the trust, whereby the latter agreed to furnish Monroe Brothers & Co. such lumber as they should need, upon these conditions, in substance: The title to all lumber then held by Monroe Brothers & Co., and of all future shipments, was to be in the name of the Oscoda Company till fully paid for, and insured by the Monroes, to be invoiced to them at agreed prices, and provided for by notes or acceptances; the Monroes to bear all expenses and receive all profits, keeping their capital, estimated at $25,000, in Cleveland, with the right in the Oscoda Company to inspect the books, and wind up the business in case of diminished capital or the death of W. R. Monroe. In March, 1882, a planing-mill was put into the same conditions of title.

This contract contemplated power in the Monroes to sell the lumber without restriction. It contained on its face no promise or purpose of doing any more for the Monroes than selling them lumber on time paper. It was, as we held before, an arrangement which, without any further privileges, had the object of putting a practically unlimited amount of the trust property in another jurisdiction and at serious risk.

But it now appears more fully than it did then that this Cleveland business was so conducted that paper aggregating several hundred thousand dollars was discounted by or through Winchester, on the credit of the Oscoda Company, for the benefit of this business, a considerable portion of which was really accommodation paper, having the effect of loans or advances by the Oscoda Company, outside of the discounting or negotiation of paper given for invoices; and it is impossible from this record to completely disentangle the various items, or get at their origin. Out of this confusion

of accounts and interests it appeared that in the spring of
1883 a balance stood against the Monroes of more than
$190,000, which was practically unsecured except by the title
nominally held by the Oscoda Company, in accordance with
the contract of 1880. It is even doubtful whether that bal-
ance actually represented lumber the invoices of which had
been met by notes or drafts remaining unpaid. So far as it
did not, there was no security beyond personal liability. It
is not necessary to follow out this matter into its details, and
it would not be practicable to do so on the testimony. It is
probable, and we are inclined to think it is certain, that there
was not lumber at Cleveland to any such amount as would
cover this balance. All the property there, including the
lumber, did not exceed it much, if at all.

In February, 1883, a freshet swept away a large quantity of
lumber from the yard at Cleveland, and damaged most which
remained. Considerable money was spent by Wasey to gather
up lumber which was swept off, and to purchase the claims of
neighboring dealers in lots which had become mixed and not
distinguishable.

Thereupon an arrangement was made between Monroe
Brothers & Co. and Wasey, with Winchester's approval then
or subsequently, and the testimony seems to indicate that
the plan has been contemplated earlier, whereby a corporation
having the same name of Monroe Brothers & Co. was got
up, and all the property of the same firm, which had already
been conveyed, February 7, 1883, to the Oscoda Company,
was put in this corporation, whose object was to continue the
same business, as well as to dispose of the damaged lumber,
and clear off the Oscoda debt. By the transfer of February
7, Wasey agreed that Monroe Brothers & Co. should be
released from any personal liability on the Oscoda debt
beyond what could be realized out of the assigned property.

The Oscoda Company, in its ultimate receipts applicable
on its claims against Monroe Brothers & Co., failed to receive

about $31,000, and between $4,000 and $5,000 interest, which should have been paid on account of that concern. The chief reason given why Winchester should not pay this is that the Cleveland business was carried on in pursuance of a plan approved by complainant himself, as it was intimated in our previous decision that, unless this was so, the dealings were in such disregard of the trust conditions as to receive no support from them.

We discover nothing in the record which supports any such idea. There is testimony tending to show, in a very general way, that complainant would have been willing to enter into liberal arrangements with Monroe Brothers & Co., but none that any such arrangements were matured, or that he would have been willing to give unlimited. time and credit to a firm who were to have all the profits and run no serious risks. The business done went far beyond anything contemplated by the agreement of October, 1880, and involved money dealings and negotiable paper transactions quite foreign to anything hinted at in that document, even if it had been approved. And, furthermore, Wasey had no authority, without, at least, the intelligent approval of his co-trustees, to close up the debt by the compromise, if it may be so called, of February 7, 1883, and still less to embark the trust interests in a partnership or corporation in which the trustees had no control. Those dealings were really Mr. Winchester's dealings, in which no one else was recognized as actually interested, and no one else was allowed to meddle.

The point made that, by the decree, an election was made to take the Cleveland interests, and that they must be taken as found, is not, in our opinion, applicable. It is by no means clear to us that the upshot of that business was not such profits as would have made up any deficiency; but it is enough to say that pursuing a trust fund in the hands of a misconducting trustee cannot be construed as a waiver of claim for his deficiencies, unless,. possibly, when

there are two funds to elect between. But here the allowance is only made for a balance remaining after the trustees have applied all that they received; and the only question is whether, by the agreement of February 7, 1880, such balance was extinguished.

An item of $3,474.33, due from Monroe Brothers & Co. to the Oscoda Company, is claimed to have been assigned to Winchester .in December, 1883. This was during the new corporate arrangement, in which Winchester had a chief part. We think the testimony shows that this assignment was made as claimed, and was a proper charge.

There is also a claim arising out of a shipment of certain lumber by the Agnes, which Winchester claims was not authorized or accepted, but which Wasey swears was authorized. We do not feel disposed to disturb this allowance.

There is also a dispute about 100 shares of boom stock, which was charged to Winchester in December, 1884, and on which he is charged with a dividend of $1,725.

These shares are part of a larger amount issued partly in consideration of certain booming rights granted to the boom company by the Oscoda Company. They were sent to Winchester, as the trustees claim, to hold merely as security. He claims that, under the trust, all proceeds of real estate were to be turned out to him, and that this stock was on that footing.

But it appears that up to December, 1884, the Oscoda Company received and applied all the dividends as their own property, and that Winchester never claimed them; and even in 1884 it rather seems that it was the spontaneous action of Mr. Gowanlock, the secretary of the boom company, who sent the dividend, and not any demand from Winchester that occasioned it. While the release of booming rights might possibly, under some circumstances, have been treated by the parties as a sale of real estate on which Winchester was entitled to the proceeds, the fact that it was practically treated

otherwise ought to leave the matter where they placed it. It was properly relegated to the trust fund.

The overpayment to Wasey, beyond his authorized salary, is covered by our former decision, and was properly set down against Winchester.

We also think that the charges for overpayment of E. F. Wasey, M. R. Gay, and R. K. Gowanlock are properly made. In the cases of Gay and Gowanlock, they had regular salaries which were understood and approved. The overpayments were not made by any concurrence of the trustees as properly due them for wages, and Mr. Wasey had no right to benefit them in an indirect and practically concealed way. They acted—Gowanlock especially—in disregard of Henry N. Loud's rights as trustee, and in the interest of Winchester, under Wasey's approval. Eben F. Wasey's allowance appears to be as large as would have been agreed upon; and in his case, as in the other cases, George Wasey could not determine on these outlays without some reference to his colleagues. Winchester's approval was not enough, unless he was the only beneficiary, which he was assumed to be.

The deduction of two per cent. on lumber shipments claimed by Winchester is not, we think, sustainable. That was understood to be the rebate for cash sales. The sales on which it is claimed were time sales, on which he got the benefit of four months' interest, which would be a little more or a little less than two per cent., according to the rate of interest.

We think Winchester should not have been charged with about $10,000 resulting from a loss on notes held by the Oscoda Company against Davison & House. These had been received with Monroe Brothers & Company's indorsement, and were renewed without it. The makers failed, and paid but 40 cents on the dollar. This paper had gone into the hands of the trustees, and they held it. Winchester had nothing to do with the extensions and consequent losses.

· An item of $305 for Wasey's traveling expenses was re-
garded below as concerning Winchester's affairs, rather than
those of the trust, and we are of that opinion.

Winchester's claim for interest on interest was properly
disallowed, as it came within no statutory authority.

He also claimed $70,000, or $10,000 a year, for financial
assistance rendered the trustees.   That assistance consisted
chiefly in discounting paper, for which he received the proper
discount rates.   He receives the stipulated interest on all of
his secured debt.   A large amount of these discounts were
such as ought not to have been obtained at all, and that
whole mode of doing business was foreign to the proper
business of the trust, unless confined to business paper.   No
good reason has been alleged why any compensation should
be given him.   Except as to the Davison & House matter, we
think the decree correct in its items as to Winchester.

It is suggested, however, that by this decree Gay's estate
should not have been benefited, even if Loud's is, because it
is claimed Gay acquiesced in most of the irregular doings.
But the question here is, how much was due on the trust
mortgage, and that is not divisible.   We do not think Gay is
shown to have been at fault personally in all these matters,
and we do not think the division is practicable.

Wasey also appeals from so much of the decree as affects
him adversely, which is done—

1. By compelling him to refund certain disbursements, and
replace certain losses.

2. By refusing him larger compensation.

The disbursements of Mr. Wasey in this suit, of between
$200 and $300, were apparently necessary, and, under all the
circumstances, as he was retained in the trust, we think he
was entitled to them.

We have had more doubt about the disbursements con-
nected with a suit by Monroe Brothers & Co. against the
trustees of the Oscoda Salt & Lumber Co.   This suit, how-

ever, does not appear to be collusive; and, whether Wasey could or could not appear for his colleagues, he had to appear for himself, and the contest may affect the trust interests. Without passing upon the sufficiency or effect of the proceedings, we think Wasey was justified in not assuming he ought to let them go by default, and should be protected in his *bona fide* reasonable expenditures. These should therefore be stricken out of the decree.

The sum of $250 paid to Perry Prentiss to settle an adverse claim against the property, as well as a deduction of $95 from an account against Cahoon & Hutchinson, whether wise or unwise, were not beyond the fair judgment of a business man.

He is also charged with $3,018.52, as a loss on a sale made to F. Hempy & Co., on the ground that it ought not to have been made. Monroe Brothers & Co. made the sale subject to Wasey's willingness to make it on Hempy's paper alone, without their indorsement, as they did not wish to increase their own credit to that firm. Hempy & Co. appear to have been in good credit, and there was no special reason to doubt their soundness. We cannot see why Wasey should be held responsible for what was not apparently an unwise sale.

The commissioner undertook to decide that Mr. Wasey's salary, as fixed and approved by this Court, should only run until September, 1885. That was a matter beyond his jurisdiction, and the salary should run until the date of the decree below, when it should cease. It was directed to continue until the further order of the court.

As to Mr. Wasey, then, the charges against him should be disallowed, and his salary stand as above mentioned.

We are not inclined to increase it. While Mr. Wasey has not perverted the trust to his own advantage, and has no doubt acted on an idea that he was doing what was competent, he has, however, honestly departed very widely from his duty to complainant, and from the safe and legal methods of

dealing with trusts. A man may lawfully run any risks he chooses with his own business, but a trustee has no right to use the trust to accommodate other parties, or to enter upon an extended course of bill discounting and indorsing with customers. When we deduct the enhanced value of the trust property due to natural advances in the prices of lands and timber, the increase, though large, is not altogether the result of good management; and we cannot avoid seeing that any casualty to Wasey or Winchester, with the accounts kept, as they seem to have been, in Wasey's method of book-keeping, which failed in tracing out the identity of a considerable number of transactions, must have been disastrous. Mr. Wasey has shown great business capacity and energy, and, had the business been his own, his course would not have been unusual.

We see no reason to differ from the court below in the matter of costs and expenses allowed, or in the saving of questions which may arise out of the Cleveland suit, which we have no means of fully determining now.

As the majority of Winchester's exceptions are disallowed, and but one of them sustained, we think that, as between him and complainant, each should pay his own costs in this Court. Wasey will be entitled to a solicitor's fee here and in the circuit, but no other taxable costs.

The decree will be affirmed, except in the particulars specified.

The other Justices concurred.