JACK BENNY AND MARY BENNY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 39123. Filed October 31, 1955.

*John B. Milliken, Esq.*, and *Harrison Harkins, Esq.*, for the petitioners.

*Daniel S. Morrison, Esq.*, for the respondent.

200

OPINION.

Rice, *Judge:* Whether the respondent erred in determining that over 90 per cent of the total sales price received by the stockholders of Amusement upon the sale of their stock to CBS and Columbia Records, Inc., was compensation to petitioner for services is essentially a question of fact. The respondent based his determination and so argues on brief that this factual question is to be decided within the framework of the broad general principle of tax law that the substance of a transaction rather than its form is determinative of its tax consequences. The petitioner accepts this posture of the case but argues that the respondent's determination is arbitrary and without foundation in fact, within the meaning of *Helvering* v. *Taylor*, 293 U. S. 507 (1935).

The record in this case contains the depositions of Paley, CBS's board chairman; Trammell, the president of NBC; Lew Wasserman, the president of MCA, petitioner's agent; George W. Whiteside, American's general counsel; and Paul Hahn, American's executive vice president at the time the transaction in question occurred. It likewise contains all relevant documents. At the hearing, Taft Schreiber, vice president of MCA and the person responsible for handling petitioner's personal contract negotiations; Myrt Blum, petitioner's business manager; Sylvan Oestreicher, one of the stockholders of Amusement; Loyd Wright, another stockholder and petitioner's attorney; and, petitioner himself, all testified at great length and were subjected to exhaustive cross-examination. There is no conflict between the testimony of the various witnesses, the depositions, and the documentary evidence. All of the evidence before us establishes beyond doubt that the substance of the transaction here in question was accurately and completely reflected by the form in which it occurred. We, therefore, can find no justification for the respondent's determination that some 90 per cent of the total sales price received by petitioner and the other three stockholders represented compensation for petitioner's services. We agree with the petitioner that that determination is without foundation in fact and cannot stand.

The respondent, on brief, requested that we make an ultimate finding of fact that $2,054,000 of the amount paid by CBS and Columbia Rec-

ords, Inc., "was compensation for [petitioner's] services in effecting a move of the Jack Benny Program to the CBS network and for rendering his services thereafter on the CBS network."

There is abundant testimony in this record that neither petitioner nor any person acting for him even intimated that he would attempt to persuade the American Tobacco Company, which, in fact, selected and contracted and paid for the network facilities on which the Benny show was broadcast, to switch the program from NBC to CBS. Petitioner had no part in the negotiations between CBS and American which led to moving the program to the CBS network in January 1949. It is equally well established that neither petitioner nor anyone acting for him promised that he would refrain from exercising his so-called veto power should American attempt to switch the broadcasting facilities of the program. It is also a fact that petitioner's future services, subsequent to the sale of Amusement's stock, were never discussed or bargained for during the negotiations. To the contrary, when that subject was mentioned in the course of the negotiations with NBC, Loyd Wright threatened to end negotiations immediately if petitioner's services were to be the subject of discussions incident to the sale of the stock. For more than a year and a half prior to the sale and for some 5½ years thereafter, petitioner's only contract for his personal services was with the American Tobacco Company.

Paley testified:

it was made perfectly clear to me by Mr. Wasserman in the first instance that in the purchase of Amusement Enterprises, Inc., in no way was I acquiring the services of Jack Benny.

In answer to the question:

is the Court to understand from your testimony that you * * * took a calculated risk as to whether or not you might be able to obtain a switch of the Lucky Strike program from NBC to CBS?

Paley replied:

I would say that was putting it pretty well, that in addition to the assets which we acquired by the purchase of Amusement Enterprises, I had high hopes that we might induce the American Tobacco Company to switch its Jack Benny program from NBC to CBS.

And to the further question:

But at the time the contract was concluded there was no certainty that you could obtain a switch of the program?

he replied:

None whatsoever. To that extent, using your language, it was a calculated risk.

The respondent argues that the question presented here is the same as in *Beals' Estate* v. *Commissioner*, 82 F. 2d 268 (C. A. 2, 1936); and

*Particelli* v. *Commissioner*, 212 F. 2d 498 (C. A. 9, 1954). In the *Beals* case, it was decided that a part of the purchaser's stock received by the selling stockholders of an ice cream company was in payment for their personal agreement not to compete with the purchaser for a period of years; and, hence, that the fair market value of the stock received for that promise was taxable to them as ordinary income. In the *Particelli* case, the court decided that the major part of the purchase price which the seller of a winery received was in payment for the wine and, hence, taxable as ordinary income. The holding of those two cases, that a part of the purchase price received by sellers upon the sale of capital assets was taxable as ordinary income, is the result which the respondent seeks here. The significant difference in those cases and the one before us is that in those cases there was a sound factual basis on which the conclusions rested. Here there is no factual basis for the determination which the respondent made. To the contrary, there is abundant specific evidence that the entire amount paid for the stock was exclusively for stock of a bona fide corporation. In addition, it is also true that the amount paid for the stock was substantially equivalent to the fair market value thereof, which is another reason why we believe that no part of such amount represented compensation for petitioner's services or for his promise to do or to refrain from doing something. Amusement's contract with American was its most valuable income-producing asset but the value of that contract was not reflected on its balance sheet. It may be true that the value of that contract was not equivalent to the anticipated total net earnings therefrom for the remaining 5½ years which it had to run because of cancellation possibilities should American's contract with petitioner end. It is, nevertheless, clear that the value of the contract in 1948, together with Amusement's other assets, far more nearly approximated the price which CBS paid for the stock than did the mere book value of Amusement's assets. In addition to the assets of Amusement, there was an additional value which its stock had to CBS in that CBS's other broadcast periods on Sunday night would be more valuable with the Jack Benny Show as the "kick-off program."

Also underlying the respondent's determination of the deficiency is his belief that the whole transaction here in question was a deliberate scheme for improper tax avoidance. We think there is no question but that the selling stockholders and those acting for them, as well as NBC and CBS, were all conscious of the tax consequences of the sale of the stock. We, however, cannot agree with the respondent's suggestion that the petitioner's concern over the consequences of the sale, taxwise, raises sinister implications that the outward appearance of the transaction was merely a cloak for a deliberate scheme of tax avoidance. We appreciate the respondent's diligence in guarding the

revenues; but it has long been recognized that a taxpayer may decrease the amount of what otherwise would be his taxes or altogether avoid them by any means which the law permits. *Commissioner* v. *Tower*, 327 U. S. 280 (1946); *Gregory* v. *Helvering*, 293 U. S. 465 (1935).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

WITHEY, *J.*, concurs in the result.

OPPER and PIERCE, *JJ.*, dissent.

ATKINS, *J.*, did not participate in the consideration of or decision in this report.

———

HARRON, *J.*, dissenting: The chief question for decision is, in my opinion, what was the fair market value of 5,000 shares of stock of Amusement Company at the time of the sale to CBS on November 13, 1948. I am unable to agree that the fair market value was $2,260,000, and I respectfully dissent for the reasons set forth below at length. A dissent ought to be brief; in this instance, brevity cannot be achieved.

The Commissioner determined that the fair market value of the stock of Amusement was $206,000. From this determination it followed that the difference between the total sum paid by CBS, namely $2,260,000, was for something other than the stock of Amusement, the difference being $2,054,000. The petitioner's burden of overcoming the prima facie correctness of the Commissioner's determination carried the burden of proving that the fair market value of Amusement stock was more than $206,000, and to succeed wholly, petitioner had the burden of proving that the fair market value of the stock was $2,260,000 on November 13, 1948. See *Merton E. Farr*, 11 T. C. 522, affd. 188 F. 2d 254. I would conclude that the petitioner failed to prove a value on the date of sale of $2,260,000. Indeed, there is no categorical ultimate finding of fact that the value was $2,260,000. The fatal weakness in petitioner's case is that his proof does not establish a fair market value of the stock of an amount which is even close to $2,260,000. On the other hand, a finding could be made that the stock had a value of $420,000 in November 1948.

It is necessary first to analyze the evidence on the matter of the value of the stock of Amusement because a related question, namely, for what else did CBS make payment, is not reached until a finding is made on the value of the stock. There is no margin between the amount of the fair market value of the stock and the sum of $2,260,000 to consider until the first question is answered.

It is necessary to advert to the evidence relating to the assets of Amusement wherein are to be found facts about the value of its stock on the date of sale. There is no evidence about any market value for the stock; its value has to be determined on the basis of the

value of Amusement's assets. However, to make a reasonable and fairly accurate appraisal of Amusement's assets several contracts must be considered, all but one being described in the findings, namely, a contract between American Tobacco Co. and NBC which was executed on July 2, 1947. This contract is described first, before considering the assets of Amusement for reasons which will become apparent later.

After the American-Benny contract of March 6, 1947, was executed, American executed a contract with NBC on July 2, 1947, under which American purchased the Red Network time on Sundays from 7 to 7 : 30 p. m. The term of the contract was for 14 weeks, commencing September 28, 1947, and ending December 28, 1947. American had options to extend the agreement with NBC for 11 additional periods of 13 weeks each by giving NBC notice of its election to extend each renewal period not less than 30 days prior to the end of the original period or of a current renewal period, as the case might be. On November 13, 1948, when CBS signed the contract to purchase the stock of Amusement, the network contract between American and NBC was in the fourth renewal period which would expire on December 28, 1948, and November 28, 1948, was the date on which American could notify NBC of its election to extend the NBC network contract for another period of 13 weeks, if American desired to do so. Absent exercise of the election by American on or about November 28, 1948, the network contract with NBC expired on December 28, 1948. It is observed that the last Sunday in 1948 was December 26, and the first Sunday in 1949 was January 2. Dates are of significance in considering the issue. It will be recalled that the findings show that on November 24, 1948, American entered into a radio network contract with CBS which was to go into effect on January 2, 1949.

Returning to the matter of Amusement's assets. It is stated that as of September 30, 1948, according to the balance sheet, the net worth of Amusement, without ascribing any value to the 1947 Amusement-American Tobacco contract, was $205,742. Passing the point of how such net worth was determined, it is observed that Amusement had been in existence only 1 year; it was apparently organized without any noticeable amount of capital; its chief asset was the 1947 contract with American Tobacco; and the net earnings *after* taxes in the first fiscal year of the contract with American was only $154,640.63 (rather than $315,000, which is the figure for $9,000 per week for 35 weeks). That is to say, Amusement's net earnings after taxes under the contract with American came to only about $4,418 per week for 35 weeks, rather than $9,000 per week before taxes, the figure mentioned by the agent, MCA, in September 1948 when the agent approached Paley of CBS.

It is presumably agreed that under the facts, the value of the stock of Amusement depended upon the anticipated net earnings, after all expenses and charges, from the 1947 Amusement-American contract. It is necessary, therefore, to look at that contract as it stood in November 1948.

It was the production contract under which American agreed to provide Benny as the star of the show Amusement was to produce. Unless a wholly unrealistic view is taken, it is a serious question under the issue, how much the 1947 Amusement-American production contract was worth if American could supply Benny as the star. The production contract of March 6, 1947, had a term of 7 years, i. e., to 1953, but there was a termination clause by which American could end the contract with Amusement, if American could not furnish Benny as the star performer in the show; i. e., if American's contract with Benny for his personal services should terminate before 1953 for any one of 5 specified reasons, one of which was the failure of American to exercise options in its 1947 contract with Benny. This leads to the 1947 American-Benny contract executed on March 6, 1947. Although the term of the American's contract with Amusement was for 7 years, American's contract for Benny's personal services had an initial term of only 3 years (156 weeks), beginning July 1, 1947, and ending July 1, 1949, with options to extend the contract for 2 additional periods of 104 weeks each (or a total of 364 weeks, 7 years).

It was on November 13, 1948, that CBS bought the stock of Amusement, and on November 1, 1948, the American-Benny contract had only 7 months (or 30 weeks) remaining until the end of the original term of the contract on July 1, 1949. Therefore, in considering the value, based on net earnings after taxes, of the 1947 Amusement-American production contract on or about November 1, 1948, it is clear that any buyer of Amusement stock who considered contract earnings seriously, could be certain only of a contract between Amusement and American Tobacco until about July 1, 1949, i. e., for an additional 30 weeks; and since Amusement's net profit *after* taxes from the contract amounted to only $4,418 per week (on the basis of 35 weeks a year), such buyer could be certain that Amusement would get net profit out of the contract of about $132,540 ($4,418 multiplied by 30), plus $75,000, the maximum penalty payable by American if it terminated the contract on July 1, 1949, or $207,540.

It could be held that petitioner has established that the fair market value of the stock of Amusement was at least $413,282 on November 13, 1948, or $420,000, to round off figures, but a value above $420,000 cannot be found unless some value is ascribed to contingencies such as exercise by American of its option to extend the Benny contract, and it is difficult to find in the record evidence upon which some

amount can be fixed as a value of contingencies. There should be no hesitation in concluding that the production contract of Amusement with American had a greatly lower value if American could not put Benny into the show, than it did if American provided the star. Petitioner has failed in his burden of proving that Amusement stock had a fair market value of $2,260,000; he succeeds in proving $420,000 which leaves a wide margin between what CBS paid and the fair value of the stock, namely, $1,840,000. But, even if this Court could ascribe a value to the contingency of American's extending its contract with Benny beyond July 1, 1949, for the extended period of 104 weeks covering two periods of production of 35 weeks each, or 70 weeks, the value of the production contract and of Amusement's stock could go up to about $309,260 (net earnings after taxes for 70 weeks, at $4,418 per week), and even that added factor would give Amusement stock a fair value of only $729,260, leaving an excess of $1,530,740 to be taxed.

Upon the record, the excess is swept into section 22 (a) which reaches gain or profit from whatever source derived. It is in connection with the application of section 22 (a) to the excess of the payment of CBS over and above the fair market value of the stock that the following authorities are in point: *Commissioner* v. *Smith*, 324 U. S. 177; *Salvage* v. *Commissioner*, 76 F. 2d 112, 113; *Robinson* v. *Commissioner*, 56 F. 2d 1008; *Beals' Estate* v. *Commissioner*, *supra*, and *Particelli* v. *Commissioner*, *supra;* *Van Dusen* v. *Commissioner* 166 F. 2d 647; *John J. Batterman*, 142 F. 2d 448. It seems to me that the majority view misconceives the posture of the question, starting as it does by approaching the problem as though the chief and first question is whether "90 per cent of the sales price * * * was compensation to petitioner for services * * *." Rather, the chief question is, how much of the total paid by CBS was for stock of Amusement? If the petitioner has failed to prove that the entire $2,260,000 was for the stock, the excess over the fair market value of the stock has to be taxed as ordinary income. The circumstances of the transaction were such that close scrutiny of the facts is permissible. *Heiner* v. *Crosby*, 24 F. 2d 191; *Weyl-Zuckerman & Co.*, 23 T. C. 841.

I find no difficulty with the second aspect of the problem, however, about the implications to be found in the facts and circumstances, and I strongly dissent from the construction given to the evidence that no part of the total sum paid by CBS represented compensation for "services" or an implied agreement of petitioner "to do something." Lacking adequate proof that Amusement stock had a fair market value of $2,260,000 on November 13, 1948, or any value even close to that figure, certain circumstances become highly important. Obviously, the objective of CBS was to get the Jack Benny Show switched away

from NBC to CBS. Amusement corporation had nothing whatever to do with broadcasting arrangements, nothing in its contract with American gave Amusement any control over the matter, and CBS could not get the show over to its network merely by purchasing the stock of Amusement. It was within the power of American to terminate its contract with NBC, and to enter into a broadcast contract with CBS. The American-NBC contract's current term fortuitously ended on December 28, 1948, and the date to exercise the extension option was November 28. American did not exercise its option, and on November 24, 1948, 11 days after CBS bought the Amusement stock, American signed a broadcast contract with CBS, which was what CBS wanted. Petitioner did not object to the change in the network arrangements. Furthermore, petitioner was not disinterested. He, on November 11, 1948, telephoned to Paley of CBS in New York and told Paley "that Amusement's stock was still available." It is not plausible that petitioner in his subjective thinking would "fool" Paley about practicalities. He shook hands with Paley when the deal with CBS was completed. Little, if any, doubt exists, after considering all of the record, that petitioner had the assurance that the Jack Benny Show would switch to CBS at the time CBS purchased the stock of Amusement and that he was capable, in some way, even by a handshake, of passing that assurance on to CBS. The petitioner's proof falls short of establishing that petitioner did not lend his services to persuading American to enter into a contract with CBS. It was worth a great deal to CBS to get a broadcast contract with American which had an exclusive contract for petitioner's personal services on the show produced by Amusement which could be extended beyond July 1, 1949. I would sustain the respondent's determination that the excess of the fair market value of the stock is taxable as ordinary income.