T.C. Summary Opinion 2004-54


UNITED STATES TAX COURT


SAMUEL S. LOWE III AND NANCY S. LOWE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2766-03S.          Filed May 11, 2004.


Samuel S. Lowe III and Nancy S. Lowe, pro sese.

<u>Horace Crump</u>, for respondent.


WHERRY, <u>Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a Federal income tax deficiency for petitioners' 2000 taxable year in the amount of $4,575.  The principal issue for decision is whether a $50,512 payment received by petitioner Samuel S. Lowe III (Mr. Lowe) under a long-term incentive plan constitutes ordinary income or capital gain.

## Background

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  At the time the petition was filed in this case, petitioners resided in Mary Esther, Florida.

During 1998, Mr. Lowe was employed as an executive of UniversalCom, Inc. (UCI).  In June of 1998, Mr. Lowe became a participant in the UniversalCom Inc. Key Executive Equity Appreciation Plan III, referred to as KEEAP II.[2]  The stated purpose of the plan was "To provide long term equity financial incentives for the key executives of UniversalCom, Inc. (UCI) while they create substantial economic value on behalf of the Company's shareholders."

The plan documentation established a "Beginning Plan Equity Value" for UCI of $12,975,000 and provided for each key employee

---

[2] The apparent discrepancy between the titles Key Executive Equity Appreciation Plan III and KEEAP II is not otherwise explained by the record.

to be awarded a certain percentage interest in the equity appreciation created beyond that value. The documentation also set forth the terms and conditions under which participants would become entitled to payment thereunder, including both "Vesting Provisions" and "Payment Events & Methods". The section entitled "Vesting Provisions" stated:

> KEEAP II is designed to be a long-term equity appreciation incentive plan. Accordingly, the Board of Directors will require a vesting period of a number of years of employment service with UCI beginning June 1, 1998 (the inception date of KEEAP II) before the key executive will earn any of his KEEAP II percentage interest. Specifically, the vesting provisions are as follows:
>
> 1) <u>Partial Vesting Period</u> - after 4 years of employment service or June 1, 2002:  50% Vested
>
> 2) <u>Full Vesting Period</u> - after 5 years of employment service or June 1, 2003:  100% Vested
>
> A key executive's departure prior to the above vesting periods will necessitate a complete forfeiture of the executive's percentage interest in the KEEAP II.

The section labeled "Payment Events & Methods" then provided the following:

> The shareholders of UCI will be responsible for settling payment obligations with KEEAP II participants only when a Liquidity Event occurs. A Liquidity Event is defined as an initial public offering of UCI's common stock, a lump sum dividend to UCI shareholders in excess of $10 million or a sale of the Company to a strategic or financial acquirer. The shareholders of UCI may settle KEEAP II obligations in cash or "in kind" in the event UCI is acquired in a stock for stock merger with a publicly traded company. In the absence of a Liquidity Event, the shareholders of UCI are under no obligation to make payments to KEEAP II participants. If a Liquidity Event occurs prior to the

June 1, 2003 full vesting period, KEEAP II members will be eligible for payment as if they were fully vested.

In the event of an initial public offering, the KEEAP II participant may elect to defer the entire payment beyond the initial public offering date thereby continuing to participate in the appreciation (or depreciation as the case may be) of the Company's equity value or may elect to receive partial payment and defer the remainder of the payment in which case his KEEAP II percentage will be adjusted on a pro rata basis for the partial payment received.

Mr. Lowe was awarded a .5 percent interest under KEEAP II.

In July of 2000, UCI merged with NewSouth Holdings, Inc. A letter dated July 13, 2000, from R. Campbell Hutchinson, vice president of NewSouth, informed petitioner that the merger had closed on July 10, 2000, and enclosed both "a check in the amount of $50,512 representing * * * [Mr.Lowe's] share of the initial purchase price for UCI" and "a summary of the calculation of the initial payment by the shareholders for their KEEAP obligation to you based on the initial purchase price."

Petitioners filed a timely joint Form 1040, U.S. Individual Income Tax Return, for 2000. Therein petitioners reported the $50,512 as long-term capital gain and attached a corresponding Schedule D, Capital Gains and Losses. The Schedule D described the underlying property as "UCI KEY APP PRO" and reflected a date acquired of June 5, 1998, a date sold of August 1, 2000, and a basis of zero.

By a notice of deficiency dated November 18, 2002, respondent determined that the $50,512 payment did not qualify

for capital gain treatment.  The notice indicated that the payers had reported the $50,512 to the Internal Revenue Service as nonemployee compensation and that the amount constituted ordinary income.

Petitioners filed their petition challenging this notice of deficiency on February 21, 2003.  The petition included the following statement of petitioners' disagreement with the adjustments:

> Two letters have been sent to the IRS with regard to this assessment.  The first letter clearly indicated that the income in question was the result of the sales [sic] of a business in which we had a small equity.  We had properly claimed this income as zero-based capital gain.  We were told that this income did not qualify as capital gain because the payer had reported this as non-employee income.  They never considered the fact the [sic] the payer might have filed incorrectly.  In at least one other instance like ours the IRS reversed their position and agreed that the income was indeed a capital gain and withdrew their claim.  Why should I be treated differently?"

A trial was subsequently held in this case, and Mr. Lowe testified in support of petitioners' position.  At the close of the trial, the parties were invited to file posttrial briefs.  Respondent filed such a brief, but petitioners did not.

## Discussion

### I.  Burden of Proof

In general, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise.  Rule 142(a).  Section 7491, effective for court proceedings that

arise in connection with examinations commencing after July 22, 1998, however, may operate in specified circumstances to place the burden on the Commissioner. Internal Revenue Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727. With respect to factual issues and subject to enumerated limitations, section 7491(a) may shift the burden of proof to the Commissioner in instances where the taxpayer has introduced credible evidence. Section 7491(c) places the burden of production on the Commissioner with respect to penalties and additions to tax.

Although the above effective date renders section 7491 applicable to the instant case, the Court finds it unnecessary to decide whether the burden should be shifted under section 7491(a). Given that the agreement pursuant to which the payment at issue was made has been stipulated by the parties, the factual circumstances underlying the transaction are undisputed. The record in this case therefore enables us to reach a decision on the merits, based upon a preponderance of the evidence, without regard to burden of proof.

II. Income Characterization

A. General Rules

As a general rule, the Internal Revenue Code imposes a Federal tax on the taxable income of every individual. Sec. 1. Section 61(a) specifies that "Except as otherwise provided",

gross income for purposes of calculating taxable income means "all income from whatever source derived". The scope of this definition is broad, typically reaching any accretions to wealth. Commissioner v. Schleier, 515 U.S. 323, 327 (1995); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-431 (1955). Among the items expressly classified as income under section 61(a) are "Compensation for services, including fees, commissions, fringe benefits, and similar items;" and "Gains derived from dealings in property". Sec. 61(a)(1), (3).

The rate of tax imposed on such income items depends, inter alia, upon their characterization as either ordinary income or capital gain. See sec. 1. Compensation for services rendered is defined and has long been recognized as ordinary income. Pounds v. United States, 372 F.2d 342, 345-346 (5th Cir. 1967); Farr v. Commissioner, 11 T.C. 552, 560 (1948), affd. sub nom. Sloane v. Commissioner, 188 F.2d 254 (6th Cir. 1951). Capital gain treatment, on the other hand, is premised on the existence of a sale or exchange of a capital asset. Secs. 1221 and 1222. A capital asset is property held by a taxpayer that is not covered by one of eight specifically enumerated exclusions. Sec. 1221.

B. Analysis

The Court concludes that the $50,512 payment received by Mr. Lowe under KEEAP II constitutes ordinary income. The evidence indicates that the payment was in the nature of

compensation for services performed by Mr. Lowe as an employee of UCI. Conversely, the record fails to reflect that the payment was made in exchange for a capital asset held by Mr. Lowe.

Awards under KEEAP II were premised on (1) employment status as a key executive of UCI and (2) employment service throughout prerequisite vesting periods. Departure prior to completion of the vesting periods would result in complete forfeiture of any award. The plan was therefore structured to create incentive for, and to reward, continued employment. The terms were consistent with a scheme to provide long-term, deferred compensation for employees.

The language of the KEEAP II document did not purport to grant participants any equity or ownership interest in UCI itself. Participants were merely afforded a contingent contractual right to monetary payment calculated by reference to appreciation in the equity value of the company. Notably, it is UCI shareholders, the equity owners, who were rendered liable to make payments to plan participants. Hence, participants did not obtain an interest in the property, the UCI shares, that was sold or exchanged in the subsequent merger.

The situation before us thus falls within the rule expressed by this Court in Hirsch v. Commissioner, 51 T.C. 121, 139 (1968), as follows:

> [The taxpayer] would have us find that if * * * [he]
> had the right to a percentage of the proceeds to be

derived from the sale of Vickter's [sole shareholder of the employer corporation, Pacific] shares, he had acquired a capital asset in Pacific. The law is clear that this type of "property interest" assumes the character of the consideration given in exchange, and under the facts of the instant case * * * [the taxpayer's] interest was not a capital asset, and its realization cannot be a capital gain under section 1222(3) of the Code.

Where an employee becomes entitled to a percentage of the proceeds from the sale of an asset, as compensation for services rendered or to be rendered, the right he receives is characterized as a right to a payment for services. Whether this right is sold to a third party or is satisfied by payment, it is now well settled that the proceeds are taxed as ordinary income. [Citations and fn. ref. omitted.]

See also Pounds v. United States, supra; Farr v. Commissioner, supra.

Moreover, Mr. Lowe testified at trial and conceded that petitioners were not pursuing the question of whether the KEEAP II payment should, as a matter of law, be characterized as capital gain. Rather, he focused on equitable concerns, as follows:

My concern is not one with the IRS, or with Mr. Crump [counsel for respondent], or any other related issue, and I certainly am not qualified to question whether this is a capital gain or not. Please believe that when this was filed, it was under the advice of the company CPA and the company controller, and not because I was contriving to reduce the amount of tax that I had to pay. As Mr. Crump's pointed out, there's no penalty involved here and I'm not trying to avoid tax.

My perspective is that I was reviewed and so was one other person who received funds from this plan. * * *

*   *   *   *   *   *   *

>   When that individual was reviewed, the corporate CPA
>   wrote a letter on his behalf to the IRS, and in the
>   results of this KEEAP 2, indeed, accepted his filing as
>   a capital gain. * * *

*   *   *   *   *   *   *

>   My only comment was that I was looking for equitable
>   treatment in this matter.  Whether or not--the company
>   was sold from one company to another.  You know, they
>   merged.  They paid out the old company owners and they
>   fulfilled their KEEAP responsibilities.  I cannot tell
>   you beyond that what I have said right now.  I'm not in
>   a position to argue that.  My whole perspective was
>   that the treatment of one member of that program should
>   be equitable.  [Emphasis added.]

Petitioners offered no further evidence or testimony directed

toward the appropriate legal classification of the income at

issue and did not file a posttrial brief.

Thus, petitioners are apparently relying on a contention

that respondent should be estopped from determining that the plan

payment is ordinary income based upon the alleged treatment of a

similarly situated taxpayer.  Although we do not doubt

petitioners' sincerity, the Court lacks any grounds for departure

from the result obtaining in this case under the governing

statutes.  To the extent that petitioners raise an argument for

equitable estoppel, their situation fails to satisfy the

requisite elements for relief.

Equitable estoppel is a judicial doctrine that operates to

preclude a party from denying its own acts or representations

that induced another to act to his or her detriment. Wilkins v. Commissioner, 120 T.C. 109, 112 (2003); Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992). In tax contexts, equitable estoppel will be applied against the Government only with the utmost caution and restraint and upon the establishment of prerequisite elements: (1) A false representation or wrongful, misleading silence by the party against whom the estoppel is claimed; (2) an error in a statement of fact and not in an opinion or statement of law; (3) ignorance of the true facts by the taxpayer; (4) reasonable reliance by the taxpayer on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects suffered by the taxpayer from the acts or statements of the one against whom estoppel is claimed. Wilkins v. Commissioner, supra at 112; Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995), affd. 140 F.3d 240 (4th Cir. 1998); see also Lignos v. United States, 439 F.2d 1365, 1368 (2d Cir. 1971).

Here, the record cannot sustain a claim for equitable estoppel. Fundamentally, petitioners did not act to their detriment in reliance upon any false representation by respondent. Petitioners chose to report the KEEAP II payment as capital gain based upon advice from third parties, and they have not alleged that communications from respondent played any part in that decision. Because petitioners' belief in their

entitlement to capital gain treatment did not stem from any conduct by respondent, equitable estoppel erects no barrier to respondent's recharacterization of the disputed payment as ordinary income.

Additionally, it long has been established that the Internal Revenue Service is not barred by mistakes of its agents from correcting errors of law, "even where a taxpayer may have relied to his detriment on that mistake." Norfolk S. Corp. v. Commissioner, supra at 60; see also Auto. Club of Mich. v. Commissioner, 353 U.S. 180, 183 (1957); Hedrick v. Commissioner, 63 T.C. 395, 403 (1974). Given that this principle holds true even in dealings with a single taxpayer, it clearly follows that allowance of a treatment contrary to law to one taxpayer does not preclude the Commissioner from correctly applying the law to other taxpayers.[3]

In conclusion, we emphasize that the Tax Court, as a Federal court, is a court of limited jurisdiction. Commissioner v. McCoy, 484 U.S. 3, 7 (1987); Hays Corp. v. Commissioner, 40 T.C. 436, 442-443 (1963), affd. 331 F.2d 422 (7th Cir. 1964). Consequently, our jurisdiction to grant equitable relief is

---

[3] This is not a situation where two similarly situated taxpayers simultaneously sought official written prefiling rulings, i.e., private letter rulings, from the Internal Revenue Service, and the Internal Revenue Service intentionally chose to treat one differently from the other at the National Office level. See Intl. Bus. Machs. Corp. v. United States, 170 Ct. Cl. 357, 343 F.2d 914 (1965).

limited.  Woods v. Commissioner, 92 T.C. 776, 784-787 (1989);
Estate of Rosenberg v. Commissioner, 73 T.C. 1014, 1017-1018
(1980).  This Court has no authority to disregard the express
provisions of statutes adopted by Congress, even where the result
in a particular case may seem harsh.  Estate of Cowser v.
Commissioner, 736 F.2d 1168, 1171, 1174 (7th Cir. 1984), affg. 80
T.C. 783 (1983).

To reflect the foregoing,

Decision will be entered
for respondent.