### SLOANE et al. v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 10915.

United States Court of Appeals
Sixth Circuit.

April 5, 1951.

Fred J. Schumann, Detroit, Mich., on the brief, for petitioner.

Theron Lamar Caudle, Ellis N. Slack, A. F. Prescott and Virginia H. Adams, all of Washington, D. C., on the brief, for respondent.

Before HICKS, Chief Judge, and SIMONS and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

Merton E. Farr, an elderly gentleman who was quite ill at the time, filed a petition to review the decision of the Tax Court of the United States determining income tax deficiencies against him for 1940 and 1941. 11 T.C. 552. He died pending the hearing of his petition. Although appropriate substitution of his executors has been made, the decedent, for the sake of clarity, still will be referred to as the petitioner. The original issue pertaining to 1940, which involved only an insignificant amount, has been withdrawn but the deficiency assessment for 1941 in the amount of $28,292.11 is a very live issue on this review.

A full statement outlining a series of involved transactions would seem to be required.

On January 27, 1926, petitioner secured an option for the purchase of 23 acres of industrial property in Wyandotte, Michigan, near Detroit. He gave interests in this option to three of his sons, who joined him in transferring it to a corporation organized by them, namely, Biddle Avenue Realty Corporation, in exchange for all the capital stock of the company.

On June 1, 1927, the corporation exercised the option and acquired the Wyandotte property at the price of $350,000. Petitioner had advanced $50,000 down payment on June 1, 1926, and the Biddle corporation paid the balance of $300,000 when it obtained title to the land.

In order to finance this transaction Biddle borrowed $300,000 on its corporate note, endorsed by petitioner, and issued to petitioner $50,000 in bonds for his advance of that amount on the purchase price. The corporation financed a part of the purchase price and carrying charges on the Wyandotte property by the sale of $265,000 of its bonds. These bonds were sold for cash at par value: $85,000 to petitioner and the remaining $180,000 to members of his family. Contemporaneously with the issue of the bonds petitioner executed a guaranty in writing of $150,000 of the total of $180,000 of bonds sold to members of his family. This guaranty was to remain in effect so long as the bonds to which it applied were kept by the original holders.

To provide collateral security for the payment of all its bonds the Biddle corporation executed an Indenture of Trust dated March 15, 1930, whereby notes signed by James S. Holden Company in the face amount of $100,000 were deposited with named trustees. All these notes were disposed of by Biddle and released by the trustees between June 9th and October 6th, 1930.

This trust indenture was modified by an amended indenture of January 4, 1934, in which the petitioner and his wife were named trustees. Under this instrument the trustees were to hold a mortgage on the Wyandotte property for the purpose of securing the $180,000 in bonds held by petitioner's family. *Petitioner expressly waived participation in the security in respect of the $85,000 of bonds held by him.* He later acquired $10,000 of the Biddle corporation bonds from a daughter, and to that extent did participate in the security of the mortgage. He was a trustee under both the original indenture of trust and the amended indenture.

The mortgage was foreclosed. At the foreclosure sale on March 23, 1937, the Wyandotte property was sold for $182,947.72 to petitioner and his wife as trustees for the holders of the $180,000 of secured bonds. These family owned bonds were applied on the purchase price to the extent of their face value.

Upon termination of its corporate existence on June 18, 1938, the Biddle corporation had no assets. This was the result of the foreclosure sale of the Wyandotte property. Its equity of redemption expired on March 23, 1938. The $85,000 of Biddle bonds owned by petitioner were, therefore, worthless on that date. An additional $10,000 of bonds which he had acquired from his daughter by an exchange of securities were secured by the mortgage. This fact must be borne in mind when he is referred to as a "secured bondholder" in the subsequently executed instruments to be hereinafter discussed. His $85,000 of the Biddle bonds had "gone where the woodbine twineth." In his in-

come tax return for 1938, he claimed a total loss in respect of these bonds, but the claimed deduction was disallowed.[1]

On October 14, 1938, petitioner and his wife, signing individually and as trustees for one son, executed an unusual instrument describing themselves in the caption thereof as trustees under the mortgage of the Biddle Avenue Corporation and, in the first paragraph of the instrument, as holders of the $180,000 of bonds secured by the Biddle mortgage. They directed themselves, as trustees, to hold title to the Wyandotte property "for the purpose of conserving, preserving, and liquidating the same for our respective pro rata benefit in accordance with your judgment and discretion as trustees, uncontrolled by us." It was recited that, "pursuant to our request, foreclosure was duly instituted by you and the property covered by the mortgage acquired by you as Trustees for our benefit." Provision was made for appointment by them of successor trustees; and they authorized themselves as trustees to convey all or any part of the property, and to otherwise manage and deal with it as trustees for the benefit of the secured bondholders as fully as if they were the absolute owners of the property. This peculiar document may be termed, as counsel have called it a "liquidating trust", though there was no time dead-line placed upon liquidation, in consequence of which the property could have been held in trust indefinitely within lawful limits.

On the same date upon which the aforementioned declaration of trust was executed (October 14, 1938), the petitioner, Merton E. Farr, and wife, signing individually and as trustees for the same son mentioned in that document, executed an unrecorded instrument entitled "Assignment to Merton E. Farr". The assignment recites that the assignors, "in consideration of services heretofore rendered on their behalf" by the assignee, Merton E.

Farr, and of one dollar paid to them by him, did sell, assign, transfer and set over unto him "all their right, title and interest in and to all the net proceeds and moneys *in excess of the sum of $182,947.72,* plus simple interest thereon after March 23, 1937, at the rate of five (5%) per cent per annum, that may be derived from liquidation of the [Wyandotte] property (or any part thereof)" described in the mortgage of the Biddle Avenue Corporation of January 4, 1934, "said mortgage having been foreclosed and the property described therein acquired by Merton E. Farr and Emma R. Farr, as Trustees, for the benefit of the parties of the first part as owners of all the bonds secured by the said mortgage." The instrument then states that the parties of the first part had "investigated said property and its value and possibilities and are convinced and acknowledged that the fair market value thereof is not in excess of the said sum ($182,947.72) which sum with interest, as aforesaid, shall be retained by and be paid to the said parties of the first part from the proceeds of the said liquidation of said property prior to the payment of said excess, if any, to second party."

The document concludes: "This assignment is and shall be a present and vested transfer of all the said net proceeds (exceeding $182,947.72 with interest as aforesaid) of the aforesaid liquidation to be effected of said property, including all the right, title and interest of first parties therein, legal or equitable, present and future, and this assignment shall not be voided or defeated by any failure or exercise of the said trust or change in title of the property or any part thereof and this instrument may be served on said Trustees, their successors in title or in interest, and constitute authority to pay said net proceeds directly to second party without the intervention of or any further action by first parties."

---

1. The reasons for the disallowance do not appear in the record, but in the commissioner's brief, it is stated that these reasons were that cost had not been sufficiently substantiated; that the bonds had become worthless in 1937, the year in which the mortgage securing them had been foreclosed; and that the parties who secured title to the Biddle corporation's assets were related to him. This statement has not been challenged by petitioner's counsel.

The tax court found as a fact that the actual consideration for the assignment included, not only his past services, but also his continued management of the Wyandotte property and his financial responsibility "for its preservation in the future as he had done in the past." [2]

On October 4, 1939, the petitioner and his wife, individually and as trustees, conveyed title to the Wyandotte Properties, Inc., as their agent for the purpose of selling the land. The corporation had been organized by petitioner under the laws of Michigan with a capital stock of $1,000 (advanced by petitioner), divided into 100 shares, ninety-eight of which were issued to him, one to his wife, and one to a son. The corporation accepted title subject to directions to be given from time to time by the petitioner and his wife, as trustees.

Pursuant to a contract of sale, confirmed by petitioner and his wife individually and as trustees, the corporation on July 15, 1941, sold and deeded the Wyandotte property to E. I. DuPont de Nemours & Company for $349,505.00 After expenses of sale, attorneys' fees, and the shares of the formerly secured bondholders were deducted, the petitioner received $114,878.77 pursuant to the above assignment.

Thirty thousand dollars ($30,000) of petitioner's share of the proceeds of the sale was placed in escrow to protect the purchaser of the Wyandotte property from an income tax lien which had been filed against the Biddle corporation by the Collector of Internal Revenue. This lien was later released as unenforceable and the $30,000 was accordingly released from escrow on July 20, 1942, and paid to petitioner.

In petitioner's original individual income tax return for 1941, the $84,878.77 received by him in 1941 was reported and fifty percent of the amount, or $42,439.34 was reported as taxable income. On July 28, 1942, an amended return for 1941 was filed by petitioner on account of the later receipt by him in 1942 of the $30,000 released from escrow. In the amended return all the $114,878.77 was reported as capital gain; and fifty percent of the amount, or $57,439.38, was reported as taxable income.

Petitioner sustained a total loss in respect of $85,000 of the Biddle corporation bonds which he had purchased in 1928 and 1929. As previously stated, he claimed this amount as a deduction in his tax return for 1938, but his claim was disallowed by the Commissioner. Petitioner also was not reimbursed by the Biddle corporation for the net amount of $12,075.66 advanced by him during the period from December 15, 1931, to March 23, 1937, for carrying charges on the Wyandotte property. He claimed a bad debt deduction of this amount for 1937 which was allowed, but he obtained no tax benefit from $8,070.95 of this deduction.

The Commissioner determined an income tax deficiency against petitioner for the taxable year ended December 31, 1941, on the ground that the $114,878.77 received by petitioner as his share of the proceeds from the sale of the Wyandotte property in 1941 was ordinary income and not capital gain.

In seeking from the tax court a redetermination of the deficiency assessment against him, petitioner stood upon the following grounds: (1) That the sum in question represented a long term capital gain; (2) that even if the amount should be considered ordinary income as compensation for services, the services extended over a period in excess of sixty months and more than seventy-five percent of the total compensation was received in one year, in consequence of which petitioner should be allowed to take advantage of the relief provisions of section 107 of the Internal Revenue Code, 26 U.S.C.A. § 107, which permit income so received to be "spread" over the years during which it was earned; and (3) that in any event he is entitled to exclude from taxable income, regardless of its nature, the $85,000 which he invested in the Biddle bonds to acquire the Wyandotte property sold and

---

2. This finding was based upon the testimony of the petitioner's attorney who had drafted both the liquidating trust agreement and the assignment. On account of extreme ill health, the petitioner had been unable to testify before the tax court.

the $8,070.95 of unreimbursed advances made by him to meet carrying charges on the same property.

The tax court rejected all three contentions and held that the $114,878.77 constitutes compensation to the petitioner for services rendered in behalf of the beneficiaries of the trust and is taxable as ordinary income under section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22 (a). The court held further that only $84,878.77, which petitioner actually received in 1941, is income taxable to him for that year; the remaining $30,000 not having been paid to him until 1942. In its well reasoned opinion, the court discussed each of the petitioner's contentions separately.

■■■■ (1) In considering whether the $114,878.77 realized by petitioner from the sale of the Wyandotte property constituted a capital gain under section 117, or ordinary income under section 22(a), the tax tribunal stated at the outset that a taxpayer must bring himself squarely within the terms of a statute of partial exemption, such as section 117 is, in order to avail himself of it. Ogle v. Helvering, 2 Cir., 77 F.2d 338, 339. It has been said many times that provisions granting special tax exemptions are to be strictly construed. For example, see Helvering v. Northwest Steel Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29. Tax exemptions are never lightly to be inferred. Heiner v. Colonial Trust Co., 275 U.S. 232, 235, 48 S.Ct. 65, 72 L.Ed. 256.

It was pointed out by the tax court that the assignment of October 14, 1938, stated specifically that the right of the petitioner to the excess proceeds over the stated amount derived from the sale of the Wyandotte property was in consideration of services rendered by him. No basis was found in the evidence for a finding that the consideration for the assignment was other than for services. By the express language of section 22(a), gross income includes that derived from compensation for personal services of whatever kind and in whatever form paid.

■■ The tax court asserted that the assignment did not make petitioner the beneficiary of the so-called liquidating trust, but all that it did for him was to provide contingently for payment of compensation for his services. No interest in the Wyandotte property was conveyed to petitioner by the assignment, which merely provided that if the property should be sold at a price in excess of a certain amount, such excess would be paid to him as compensation for services. We think the tax court was right in its conclusion that the $114,878.77, received by petitioner from the sale of the Wyandotte property, is not to be declared capital gain under section 117, but represents ordinary income under section 22(a) of the Internal Revenue Code.

The court considered Strauss v. Commissioner of Internal Revenue, 2 Cir., 168 F.2d 441, an important authority for its conclusion and thought that a comparable factual situation was presented. There, it was held that compensation to the taxpayer for financing services rendered, which entitled him to receive percentages of royalties from a process used in manufacturing colored film, was taxable to him as income even though he had assigned all interest in the process to his wife who had received the royalties after the assignment. The taxpayer had obtained his right to the percentage of the royalties by performing "certain personal services in connection with the financing" of the process. The Court of Appeals said that the taxpayer had not received for his services any part of the process but had obtained only an enforceable promise of the owners of the process to pay him for his services a definite portion of the royalties. It was asserted that the taxpayer's interest in the process was never greater than the contract right to be paid certain ascertainable sums of money. In principle, the Strauss case bears analogy to the case at bar.

■■■ In the tax court, the petitioner placed much dependence—and continues to do so—upon the decision in Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406, in which the proceeds of capital assets sold on the installment plan

had been given in trust to a beneficiary. It was held that payments received by her after deduction of the seller's basis were taxable as capital gains and not as ordinary income. This holding was analyzed to the proposition that income distributed to the beneficiary of a trust has the same status in the hands of the beneficiary, either as capital gain or as ordinary income, as it would have in the hands of the trustee. The Hopkinson case was distinguished from the instant controversy in that the assignment in the present case did not effectively make the petitioner the beneficiary of a trust. We consider the distinction sound.

The liquidating trust did not empower petitioner, in his capacity as trustee, to act for his own benefit but solely for that of the secured bondholders. The assignment gave him no participation in the proceeds of the sale of the property, unless it should be sold for a price in excess of a specified amount. As has been shown, it was asserted in the assignment that at the time of its execution the parties had investigated the value of the Wyandotte property and its possibilities, and were convinced and acknowledged that its fair market value was not in excess of · $182,947.72. All petitioner had was a contingent expectancy in money, if ever realized, from the sale of trust property in excess of a stipulated amount agreed to be its full value. The trust was created for the benefit of others, and petitioner received only the possibility of the realization of compensation for services rendered the beneficiaries. This is our interpretation of his ultimate rights under the trust agreement and the assignment, both executed on October 14, 1938, and, therefore, to be construed together. By his own action in claiming a total loss in 1938 on his investment made more than ten years before, he himself had treated his investment as lost. He and the members of his family, by the trust instrument and the assignment, have simply attempted to restore him as far as possible; but their actions were not effective under applicable taxing statutes to permit the amount recovered

by him to be treated as capital gain and not as ordinary income.

In tax litigation perhaps more frequently than in the mill-run of other types of justiciable controversy, cases adduced by advocates or revealed by independent research to be of some authoritative value are generally so variant in factual setting as to render detailed discussion of them often more confusing than helpful. With this thought in mind, we merely cite a few illustrative cases selected from many which are deemed supportive of the principles upon which our decision rests. Some of these cases relate to one facet, others to another, of the problem which has been resolved. Considering these authorities together, the net effect of the decisions and expressions in them makes us confident that our decision upon the issue presently before us constitutes no departure from the norm. Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 31, 61 S.Ct. 757, 85 L.Ed. 1168; United States v. Safety Car Heating & Lighting Co., 297 U.S. 88, 99, 56 S.Ct. 353, 80 L.Ed. 500; Allen v. Trust Co. of Georgia, 5 Cir., 180 F.2d 527; Ansorge v. Commissioner of Internal Revenue, 2 Cir., 147 F.2d 459; Mulqueen v. Commissioner of Internal Revenue, 2 Cir., 65 F.2d 365; United States v. Archer, 1 Cir., 174 F.2d 353, 356.

Though we have omitted reference to numerous cases cited in the briefs of the attorneys, each case has been read and considered.

However, cases stressed by petitioner as authority for his position will be briefly distinguished: first, Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788. Figuratively speaking, the "bundle of rights" in the Clifford trust was bound with whipcord; the "bundle of rights" in the Farr family trust is tied with frail cotton thread. Wherefore, the tax consequences are not the same. Nor is Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465, helpful to petitioner. In that case, a will creating a trust was held to entitle a beneficiary during his lifetime to the net income from the trust profit. This made him, without doubt, owner of an equi-

table interest in the corpus of the trust. Likewise, in McAllister v. Commissioner, 2 Cir., 157 F.2d 235; in Farkas v. Commissioner of Internal Revenue, 5 Cir., 170 F.2d 201; and in Hawaiian Trust Co. v. Kanne, 9 Cir., 172 F.2d 74; each of the respective beneficiaries having a right to income for life from a trust estate was held to have an equitable interest in the estate itself. Belknap v. Glenn, D.C.W.D.Ky., 55 F.Supp. 631, decided by Judge Miller when district judge, comes within the same category. Here, the petitioner had no right to income from the trust estate. His only right was to the excess proceeds over a specified sum when the corpus of the trust estate was sold.

In his reply brief, petitioner brings forward Loud v. Winchester, 52 Mich. 174, 17 N.W. 784. There, an insolvent firm deeded its business and other property to its principal creditor who conveyed it in trust to other persons to be managed under broad powers for his exclusive benefit. Contemporaneously, the creditor and the trustees executed a declaration of trust in favor of the firm whereby, upon satisfaction of the trust, the remainder of the property was to be conveyed to the firm. The Supreme Court of Michigan held that as between the parties to the arrangement a trust and not a mere mortgage relationship had been established, thus placing the creditor under fiduciary obligations to the debtor.

The only similarity between the Michigan case and this one is that, there, the plaintiff was interested in the excess of the corpus of the trust over his debt, and here the petitioner was interested in the excess over a stipulated sum derived from the sale of the trust property. In the wholly different circumstances of the two cases, this similarity seems immaterial to the decision of the tax problem presented for solution.

(2) As an alternative proposition, petitioner urges that should the income in controversy be considered not capital gain but compensation for personal services, such services rendered directly to the bondholders extended at least for a period in excess of sixty months; and that having received more than seventy-five percent of his total compensation in one year, he should be permitted under the provisions of section 107 of the Internal Revenue Code[3] to spread the amount over the years during which the services were rendered. The argument cannot stand; for, as a matter of fact, he did not receive more than seventy-five percent of his compensation in one year. Of the total amount of $114,878.77 paid to him from the proceeds of the sale of the Wyandotte property, he received $84,878.77 in the taxable year 1941 and the remaining $30,000 on July 20, 1942. Therefore, he received in 1941 only 73.88 percent of the total compensation, which is slightly less than the percentage necessary to bring him within the provisions of section 107. Petitioner came close to the required percentage, but close is not enough. A tax petitioner seeking beneficial relief under section 107, which is an exemption statute to be strictly construed, must bring himself clearly within its requirements. See Smart v. Commissioner of Internal Revenue, 2 Cir., 152 F.2d 333, 335; and Lindstrom v. Commissioner of Internal Revenue, 9 Cir., 149 F.2d 344, 346. Both these cases related to construction of section 107. Cf. Helvering v. Northwest Steel Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29.

We find no validity in the contention that the $30,000 paid petitioner in 1942

3. "If at least 75 per centum of the total compensation for personal services covering a period of sixty calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual. * * *" Sec. 107, as added by section 220(a), Revenue Act of 1939, c. 247, 53 Stat. 862, and amended by Section 139(a) and (b), Revenue Act of 1942, supra, 26 U.S.C.A. § 107.

was constructively received by him in 1941. During 1941, the $30,000 was held in escrow by a bank which was obligated to see that petitioner fulfilled the conditions of the escrow agreement before the money could be paid to him. Until the tax lien on the Wyandotte property was discharged, the petitioner was not entitled to receive the money. He had no control over the situation, which rested upon what course of action the United States Government would pursue. Petitioner neither received the $30,000 in 1941 nor had such control or disposition over it as would make him for income tax purposes a constructive recipient.

We are not in accord with the tax court in its determination that petitioner's services which supplied the basis for his recognition in the assignment agreement commenced only when the trust mortgage was foreclosed on the Wyandotte property on March 23, 1937. We think it clear that the parties contemplated that the assignment to petitioner would cover contingent compensation for his services for a period beginning long before that date. Certainly, no time limitation was specified in the assignment. Indeed, his services rendered the bondholders extended far beyond sixty months from the beginning to the completion of his care for the bondholders' investment and his management of the property securing the bonds. But our disagreement with the tax court on this point only brings petitioner partially within the coverage of section 107 of the Internal Revenue Code; that is, within the requirement that the personal services for which total compensation is allowed must cover a period of sixty calendar months or more from the beginning to the completion of the services. Petitioner has failed to bring himself within the essential percentage requirement of section 107 and, therefore, can obtain no relief or benefit from the exemption statute.

(3) The final contention of the petitioner is that, regardless of the nature of his income, he was entitled to exclude therefrom $85,000 invested in bonds of the Biddle Avenue Corporation and $8,070.95 of advances made by him to that corporation for carrying charges. He insists that until he received a return of the aggregate of the two amounts, that is, $93,070.95, he actually realized no economic gain upon which he could be taxed. He urges that if the tax court decision is permitted to stand the taxpayer will actually pay a capital levy and will suffer an out-of-pocket loss in the sum of $36,545.39; and that this result would be unjust inasmuch as all his actions in relation to his investment in the Biddle company bonds were interrelated and interwoven and pertained to the same *res*, that is, the acquisition, management and sale of the Wyandotte property. He cites in support of his argument: Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; Bowers v. Kerbaugh-Empire Co., 271 U.S. 170, 46 S.Ct. 449, 70 L.Ed. 886; and Boehm v. Commissioner of Internal Revenue, 2 Cir., 146 F.2d 553.

In the Dobson case, the Supreme Court made it clear that it was "not adopting any rule of tax benefits", but was holding only that "no statute or regulation having the force of one and no principle of law compels the Tax Court to find taxable income in a transaction where as matter of fact it found no economic gain and no use of the transaction to gain tax benefit." 320 U.S. 506, 64 S.Ct. 249, 88 L.Ed. 248. Here, the tax court pointed out that one certain requirement for invoking the tax benefit rule is that there be such an interrelationship between the event which constitutes the loss and the event which constitutes the recovery that they can be considered as parts of one and the same transaction. The tax court stated that in all cases cited by the petitioner as authority for applying the concept that where there is no economic gain there is no taxable income, the factual situations revealed a close integration of events producing the loss and the gain; and that in each instance the property on which the loss was suffered could be traced into the transaction producing the gain. The court was unable to find such interrelationship between the steps which resulted in losses to the petitioner and the events which produced the gain in question as to per-

mit them to be considered one and the same transaction. We are in accord with the reasoning of the tax court in the light of the facts in the record.

As is pointed out by the Commissioner in his brief, the bonds owned by the petitioner and the advances made by him represented loans to the Biddle corporation. As a result of the foreclosure sale of the Wyandotte property on March 23, 1937, that corporation's debt to the petitioner became worthless and was extinguished when the corporate charter expired. Not until October 14, 1938, did the secured bondholders who had purchased the Wyandotte property at foreclosure sale execute the assignment by virtue of which the petitioner ultimately received $114,878.77. The assignment did not recite that it was made because of loans made to the corporation by petitioner, but on the contrary stated that it was made for services rendered by him to the secured bondholders. There was not the necessary relationship between the money previously loaned by the petitioner to the corporation and the money received by him from subsequent owners of the Wyandotte property for services rendered to them to bring the case within the tax benefit theory. In each of the above cited cases adduced by the petitioner there was, as stated by the Commissioner, a close integration in the events which produced respectively the loss and the gain. Here, such close integration is lacking.

Allen v. Trust Co. of Georgia, 5 Cir., 180 F.2d 527, certiorari denied 340 U.S. 814, 71 S.Ct. 43, would seem to be the case closest in point. There, the court of appeals reversed a judgment of the district court in favor of a taxpayer, and held that where he had in 1932 accepted stock in satisfaction of a bad debt, but only a portion of the loss on the debt was a tax benefit, he could not exclude from gross income in 1940 a portion of the gain on the sale of the stock in that year on the theory that such sale was a recovery of the loss suffered in 1932, since the debt was no longer in existence in 1940 and the sale of the stock was a separate transaction.

For a recent decision of this court, in which we presented our views as to when transactions in a series do or do not constitute integrated steps as part of a single plan, see Tennessee, Alabama & Georgia Railway Company v. Commissioner of Internal Revenue, 6 Cir., 187 F.2d 826. See also National Bank of Commerce in Memphis v. United States, D.C., 87 F.Supp. 302, affirmed, per curiam, 6 Cir., 180 F.2d 356, certiorari denied 340 U.S. 822, 71 S.Ct. 55.

The decision of the tax court is affirmed.