**Ernest L. SMITH and Margaret B. Smith**

v.

**UNITED STATES of America.**

**Ernest L. SMITH, Trustee, E. L. Schmidt Trust**

v.

**UNITED STATES of America.**

**Civ. Nos. 14968, 14969.**

United States District Court
D. Maryland.

Dec. 28, 1965.

John Lewis Kelly, Washington, D. C., for plaintiffs.

Moshe Schuldinger, Atty., Dept. of Justice, Washington, D. C. (Thomas J. Kenney, U. S. Atty., and Robert W. Kernan, First Asst. U. S. Atty., Baltimore, Md., and Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston and David A. Wilson, Jr., Attys., Dept. of Justice, Washington, D. C., on brief) for defendant.

THOMSEN, Chief Judge.

The two actions now before the Court seek refund of federal income taxes and interest for the years 1953 and 1954. One action is brought by individual taxpayers, Ernest L. Smith and his wife, Margaret B. Smith; the other is brought by Ernest L. Smith as Trustee of the E. L. Schmidt Trust, an inter vivos trust created in 1931.

Ernest L. Smith and Eugene A. Smith are the two sons of E. L. Schmidt, who died in 1938. To minimize confusion, they will be referred to herein as "Ernest", "Eugene" and "Schmidt", respectively. Where the reference is to Ernest as Trustee, he will be called "Ernest, Trustee", or simply "the Trustee". Where questions are common to both suits, the plaintiffs will be referred to collectively as "taxpayers".

## Questions Presented

1. Whether payments made by C & S Realty Corp. to Ernest, Trustee, in 1953 and 1954 constituted (a) ordinary income from collections on certain second trust notes, or (b) capital gain income from a sale or exchange of the notes.

2. Whether the amounts distributed to Eugene by Ernest, Trustee, as a result of the payments made by C & S Realty Corp. were taxable (a) to the Trust or (b) to Eugene. If they were taxable to Eugene, should Ernest, Trustee, be permitted to recover herein for taxes paid by him as Trustee when assessment of such taxes against Eugene is barred by the statute of limitations?

3. Whether the basis of the second trust notes was properly determined; specifically, whether the basis should have included an amount previously deducted by taxpayers without any tax benefit.

## Facts

Most of the facts are contained in a written stipulation and in oral and written supplements thereto and modifications thereof at the trial. The following statement recites such of the stipulated facts as are necessary to understand the legal issues, and includes a few facts which have been found from depositions of Ernest and another, which were offered in evidence.

In 1931 Schmidt held a note from Eugene A. Smith, Incorporated (Smith, Inc.), in the face amount of $163,000. That note was secured by eleven second trust notes in the amount of $25,000 each, a total of $275,000. The eleven notes were, in turn, secured by a second trust on the Conard Apartment, Washington, D. C. In 1931 the Conard Apartment was owned by Smith, Inc., and that corporation was wholly owned by Eugene. There was no personal liability on the maker of the eleven notes, who was a straw party.

By an indenture dated February 24, 1931, Schmidt, a resident of the District of Columbia, created the Schmidt Trust, with Ernest as Trustee. Schmidt transferred all his assets to the Trust, except some stocks and household effects. Among the assets transferred were the note of Smith, Inc., for $163,000, and the eleven second trust notes on the Conard Apartment, which secured the $163,000 note.

Under the terms of the trust indenture the grantor, Schmidt, was entitled to the income for life. Upon his death, the corpus of the trust was to be divided into two equal parts, one of which was to be "assigned, conveyed, transferred and set over unto Ernest L. Smith, individual-

ly, for his absolute use and benefit". The remaining one-half remains in trust during the life of Eugene, who receives the income from that half, but, by reason of certain spendthrift provisions contained in the trust instrument, cannot pledge or otherwise dispose of his interest. On the death of Eugene, his interest is to be paid over to such of the heirs of Schmidt as *Ernest* may by will appoint or, in default of appointment, to such heirs of Schmidt as would take in accordance with the statutes of distribution of the District of Columbia.

After the death of the grantor in 1938, Ernest, Trustee, continued to treat as part of the trust assets the one-half share thereof to which he was then absolutely entitled, and continued up to and including the taxable years 1953 and 1954 to administer the trust as a single taxable entity with two beneficiaries. This was done for ease of administration, because the assets were not readily divisible. Eugene and Ernest thereafter shared equally in all distributions of the income of the trust. In the administration of the Trust, Ernest as Trustee treated amounts which he believed to be capital gains as distributable income rather than as an increase in corpus, and distributed such amounts currently to Eugene as well as to himself individually.

As early as 1931, Smith, Inc., was in serious financial difficulties. To satisfy its creditors, and in accordance with an agreement dated December 23, 1931, Smith, Inc., conveyed the Conard Apartment and other real property to Washington Apartment Securities Corporation (Securities Corp.), and Smith, Inc., received 4,750 shares of common stock of Securities Corp. Under the terms of the agreement, Securities Corp. was to manage the properties and to apply the rentals to the operation thereof and to the payment of taxes and other obligations due thereon. At the time Securities Corp. took over the Conard Apartment, that property was subject to a first trust of $531,875, which was held by the Metropolitan Life Insurance Company, and to a second trust securing notes totaling $275,000, which were held by Ernest as Trustee of the Schmidt Trust. Securities Corp. did not assume payment on the second trust notes. Smith, Inc., engaged in no further activity after the transaction described in this paragraph, and at some unspecified time thereafter was dissolved. The properties other than the Conard Apartment were subsequently abandoned to the creditors of Smith, Inc.

Securities Corp. recorded upon its books the acquisition of the Conard Apartment and the first mortgage thereon. Although not recorded initially, the second trust notes totaling $275,000 were recorded later on the books of Securities Corp. as "trust notes receivable—pledged".

No payment of any kind was ever made on the $163,000 note of Smith, Inc. In 1938, Ernest, Trustee, acquired ownership of the collateral securing the $163,000 note by giving a $100,000 credit on that note, which was endorsed as follows: "3/19/38 Sold Collateral described on face hereof to Ernest L. Smith, Trustee for $100,000. [signed] Bernard I. Nordlinger. Witness: J. H. Oehmann."

The $63,000 difference between the face value of the note and the $100,000 credit given for the collateral was treated as uncollectible; Ernest, Trustee, wrote the $63,000 off as a bad debt in 1938 and deducted this amount in the 1938 fiduciary income tax return which he filed for the Schmidt Trust. As a result of that deduction, the fiduciary return showed a distributable loss for the taxable year and the distribution of the loss equally between Ernest and Eugene.

Upon audit of that return by a revenue agent it was determined that no part of the loss was distributable to Eugene, but that one-half of the loss was deductible by the Trust and one-half by Ernest. Because of other deductions the tax benefit of this loss to the Trust was only $2,505.71. Ernest and his wife Margaret took as a deduction on their joint income tax return for the taxable year 1938 the sum of $28,945.70, being the

portion of the loss reported on the fiduciary return as distributable to Ernest. The tax benefit of this distributed loss to Ernest, as a deduction, was $12,122.47.

Ernest, Trustee, thereafter sought payment of the second trust notes from Securities Corp. When they were not paid, he advised Securities Corp. by letter dated June 15, 1938, that he must insist upon a foreclosure of the collateral securing the second trust notes which he held unless the corporation delivered to him or his nominee a deed to the Conard Apartment. On June 17, 1938, the stockholders of Securities Corp. resolved that the Conard Apartment be conveyed to Ernest, Trustee, or his nominee, without merging his equitable lien with the legal title. At the same meeting it was decided to dissolve Securities Corp.[1]

By letter dated August 2, 1938, Ernest requested Securities Corp. to execute a deed conveying the Conard Apartment to C & S Realty Corporation subject to the first and second deeds of trust securing debts of $476,000 and $275,000, respectively.[2] C & S Realty Corporation (Realty Corp.) was owned and controlled by Ernest individually.

Securities Corp. conveyed the Conard Apartment to Realty Corp. on August 4, 1938, ceased its activities and was subsequently dissolved. At a special meeting of the board of directors of Realty Corp. on August 2, 1938, the directors authorized acceptance of the deed conveying the property, noting that it was subject to a first deed of trust securing Metropolitan Life Insurance Company in the approximate amount of $476,000 and subject to a second deed of trust in the approximate amount of $275,000.

Realty Corp. did not assume the second trust obligation. However, on its balance sheets for fiscal years ending July 31, 1942, through July 31, 1953, Realty Corp. reported the current outstanding balances of *both* the first and second trusts as representing mortgages payable. Moreover, beginning in the year 1944, Realty Corp. made payments to Ernest, Trustee, of accrued interest on the second trust notes. Eventually, all of the interest due on those notes was paid by Realty Corp. to Ernest, Trustee.

In addition to the interest, Realty Corp. made payments to Ernest, Trustee, in each of years 1944 through 1954, with the exception of the years 1946, 1948 and 1950, as follows:

| | | | |
|---|---|---|---|
| 1944 | $ 10,000 | 1951 | $ 10,000 |
| 1945 | 10,000 | 1952 | 25,000 |
| 1947 | 15,000 | 1953 | 15,000 |
| 1949 | 10,000 | 1954 | 180,000 |

Those payments total $275,000, the face amount of the second trust notes.

The final payment of $180,000 was made under the following circumstances: In 1954 Realty Corp. was offered an opportunity to refinance the first and second trusts by consolidating them into a single obligation. At a special meeting of stockholders of Realty Corp., held on September 15, 1954, a resolution was passed authorizing the board of directors to accept the offer of new financing by a single loan of $400,000, at 4½% interest, to be made by Interstate Building Association of Washington, D. C. As a condition to the loan, Realty Corp. was required to eliminate both trusts on the Conard Apartment. Interstate Building Association deposited with a title company the amount of the loan, to be paid

---

1. At the time of the dissolution of Securities Corp. there were outstanding 5,000 shares of its stock, owned as follows: 4,750 shares by Smith, Inc., which had been received by Smith, Inc., as consideration for the properties it had conveyed to Securities Corp.; 240 shares by Smith, Inc., for services rendered; and 10 shares by the incorporators as qualifying shares.

2. The letter requested a deed "transferring said building and all appurtenances and equipment thereto belonging or in anywise used in connection with the operation thereof, and all supplies on hand, to the C & S Realty Corporation, a corporation organized under the Laws of the State of Maryland, in fee simple, subject to a first deed of trust securing a debt in the approximate sum of $476,000, and further subject to a second deed of trust securing a debt in the approximate sum of $275,000."

over when title was approved. At the settlement, Ernest, Trustee, marked the eleven notes "Paid and Cancelled" over his signature and the date, October 5, 1954, and received the final payment of $170,000 cash and a $10,000 short-term note of Realty Corp. .

The payments other than interest received by Ernest, Trustee, from Realty Corp. during the years 1944 to 1954 were reported on the annual fiduciary returns which he filed for the Schmidt Trust as long-term capital gains from the instalment sale of real estate notes. There was no written agreement evidencing any such instalment sale, and the depositions with respect thereto are not convincing. The Court finds as a fact from the credible evidence in the case that there was no instalment sale of the second trust notes, but that they were paid off in instalments by Realty Corp. to Ernest, Trustee, who held and owned those notes. The law with respect to this point is discussed below.

In his fiduciary returns Ernest, Trustee, reported the cost basis of the eleven second trust notes totaling $275,000 as $100,000. In each year that a payment was received he reported 63.63% of the amount received as gain, based upon the difference between the cost basis and the total amount of the notes. The returns showed the gains as having been distributed to Ernest and Eugene individually.

Ernest, Trustee, filed such fiduciary returns for the taxable years 1953 and 1954. Both Ernest and his wife and Eugene and his wife filed with the District Director joint returns for the years 1953 and 1954, which included the "capital gains" referred to above, and paid the income taxes shown to be due on said returns.

Upon audit of the returns of the Schmidt Trust, of Ernest and his wife, and of Eugene and his wife for the years 1953 and 1954, the examining agent concluded: (1) that the $195,000 payments made on account of the second trust notes by Realty Corp. to Ernest, Trustee, in 1953 and 1954 were ordinary income from collections on said notes rather than capital gains from a sale or exchange of the notes, and (2) that the amounts distributed by Ernest, Trustee, to Eugene as a result of those payments were taxable to the Trust and not to Eugene.[3] Accordingly, the agent recommended and the District Director determined that additional income taxes for those years were assessable against Ernest as Trustee of the Schmidt Trust, and against Ernest and his wife, individually, but that there had been an overassessment of taxes against Eugene and his wife of $1,002.18 for the year 1953 and of $13,075.57 for the year 1954. The overassessments did not result in any refund to Eugene and his wife, but were credited, together with interest thereon, against the deficiencies assessed against the Trust.

1.

Were the amounts received by taxpayers in respect to certain second trust notes long-term capital gains from a sale or exchange of the notes or ordinary income from collections on the notes?

The controlling legal principles are not disputed:

"It is quite clear that ordinarily * * * when a taxpayer makes a gain from the sale or exchange of a claim or chose in action, this is taxable as a capital gain; while if the gain results from the collection of the claim or chose in action, this is taxable as ordinary income. Fairbanks v. United States, 306 U.S. 436, 59 S. Ct. 607, 83 L.Ed. 855; Herbert's Es-

3. The deficiencies were asserted against the trust on the ground that the distributions passed on to Eugene were not properly deductible by the trust. Ernest, owning one-half of the Trust assets outright, was clearly taxable on the amounts distributed to him since the receipts were in no event taxable to the Trust. This was because the distributions were made out of corpus and were not "properly paid or credited or required to be distributed for such taxable year". See sections 661(a) and 162(c) of the 1954 and 1939 Codes, respectively.

tate v. Commissioner [of Internal Revenue], 3 Cir., 139 F.2d 756, 758; Lee v. Commissioner [of Internal Revenue], 7 Cir., 119 F.2d 946; Helvering v. Roth, 2 Cir., 115 F.2d 239, 241; Bingham v. Commissioner [of Internal Revenue], 2 Cir., 105 F.2d 971, 972; Hale v. Helvering, 66 App. D.C. 242, 85 F.2d 819. See, also, Cooper v. Commissioner [of Internal Revenue], 4 Cir., 197 F.2d 951." Osenbach v. Commissioner of Internal Revenue, 4 Cir., 198 F.2d 235, 236–237 (1952).

Realty Corp. was the owner of the real estate (the Conard Apartment) which secured the $275,000 of second trust notes. It had not assumed an obligation to pay the notes at the time it took title to the property, but it did pay interest on the notes and made certain payments on account of principal during the years 1944 to 1953. It was required to pay off the notes and obtain a release of the second trust in October 1954 before the Interstate Building Association would lend it money on a new refunding mortgage or deed of trust.

At the settlement the notes were marked "Paid and Cancelled" by Ernest, Trustee; they were not endorsed to Realty Corp. There would have been no point in endorsing them to Realty Corp. because there was no one from whom Realty Corp. could have collected. It is stipulated that there was no personal liability on the part of the straw man who executed the notes originally. The situation was essentially the same as that presented in Bingham v. Commissioner of Internal Revenue, 2 Cir., 105 F.2d 971, 972 (1939), where the Court said:

"What may have been property in the hands of the holder of the notes simply vanished when the surrender took place and the maker received them. He then had, at most, only his own obligations to pay himself. Any theoretical concept of a sale of the notes to the maker in return for what he gave up to get them back must yield before the hard fact that he received nothing which was prop-

erty in his hands but had merely succeeded in extinguishing his liabilities by the amounts which were due on the notes. There was, therefore, no sale of the notes to him in the ordinary meaning of the word and no exchange of assets for assets since the notes could not, as assets, survive the transaction. That being so, such a settlement as the one this petitioner made involved neither a sale nor an exchange of capital assets within the meaning of the statute." The form as well as the substance of the transaction shows that the notes were paid off and not sold.

The deposition testimony that there had been a prior instalment sale of the notes by Ernest, Trustee, to Realty Corp. (of which Ernest owned all the stock) is not convincing. The attorney, Eakle, who served as president of Realty Corp., when asked why the payments were made to Ernest, Trustee, testified: "It was on account of the instalment sale—well, if you want to call it a sale—on account of the transaction. As moneys become available to C & S Realty, payments were made on account". The weight of the credible evidence is that as Realty Corp. had money available, it made payments on account of the principal of the notes, which were a lien on its property and carried on its books as a liability, even though not assumed by any agreement.

■ It is true that taxpayers treated the payments from 1944 on as capital gain, and it does not appear that this treatment was questioned by the government until the audit of the 1953 and 1954 returns. However, it was not until the final payment was made in 1954 and all the notes marked "Paid and Cancelled" that the true nature of the transaction became obvious. The Court concludes that the payments made by C & S Realty Corp. to Ernest, Trustee, in 1953 and 1954 constituted ordinary income.

2

Were the amounts distributed to Eugene by Ernest, Trustee, as a result of the payments made by C & S Realty

Corp., taxable (a) to the Trust or (b) to Eugene? If they were taxable to Eugene, should Ernest, Trustee, be permitted to recover herein for taxes paid by him as Trustee when assessment of such taxes against Eugene is barred by the statute of limitations?

This Court has determined that the payments constituted ordinary income; under the Trust Indenture they were clearly distributable, one-half to Ernest and one-half to Eugene, and were therefore taxable to them and not to the Trust under sec. 643(a) of the 1954 Code and sec. 162(d) of the 1939 Code, which was applicable to the tax year 1953.[4]

Nevertheless, the revenue agent who examined the returns of the Trust and of the brothers and their respective wives for the years 1953 and 1954 determined that the Trust rather than Eugene was taxable on the distributions made to Eugene. See note 3, above. Accordingly, the District Director assessed additional taxes against the Trust (for which recovery is sought herein), and determined that there had been an overassessment of taxes against Eugene and his wife of $1,002.18 for the year 1953 and of $13,075.57 for the year 1954. The overassessments did not result in any refund to Eugene and his wife because the amount of the overassessments against Eugene and his wife for those two years were credited, with interest, against the deficiencies assessed against the Trust.

Plaintiffs herein contend: that since the distributions to Eugene were properly made to him and were taxable to him, any additional assessment should have been made against him; that the assessments against the Trust were erroneous; and that Ernest, Trustee, is entitled to recover herein the amount of the additional assessment against the Trust even though the government is barred by limitations from collecting the additional tax from Eugene at this time.

The government argues that the doctrine of equitable recoupment applies, and that it is entitled to retain as against the Trust the additional tax which should have been assessed against and paid by the beneficiary, Eugene.

Cases in the Supreme Court and in the Fourth Circuit support the government's position. In Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 81 L.Ed. 1265 (1937), the testator, by his will, left property in trust to pay over the net income to his wife as sole beneficiary at such times and in such amounts as she should deem best, during her natural life. She elected to take the bequest under the will in lieu of her dower or statutory interest.

4. It is not necessary for this Court to decide whether the payments would have been distributable under the terms of the Trust Indenture if they had been capital gains. However, it is stipulated that Ernest, Trustee, treated as distributable income and not as additions to corpus all amounts received by him as Trustee which he determined were capital gains, and that he distributed such amounts to himself and his brother as beneficiaries of the Trust. It appears, therefore, that even if the payments were capital gains, they were taxable to the individuals and not to the Trust, because of sec. 1.643(a)–3 of the Treasury Regulations on Income Tax, 1954 Code, which provides:

"Sec. 1.643(a)–3. *Capital Gains and Losses.*

"(a) Gains from the sale or exchange of capital assets are ordinarily excluded from distributable net income, and are not ordinarily considered as paid, credited, or required to be distributed to any beneficiary unless they are:

" * * *

"(3) Utilized (pursuant to the terms of the governing instrument or the practice followed by the fiduciary) in determining the amount which is distributed or required to be distributed.

" * * *

"(26 C.F.R., Sec. 1.643(a)–3.)"

Sec. 1.643(a)–3 of the 1954 Regulations did not apply to the taxable year 1953, but sec. 162(b) of the 1939 Code (26 U.S.C.A., 1952 ed., sec. 162), effective for the year 1953, is substantially similar to sec. 651(a) (1) and (2) of the 1954 Code, and nothing has been cited or found in the 1939 Code or the Regulations applicable to the taxable year 1953 which would make inapplicable the *principle* set out in Regulation sec. 1.643(a)–3.

The beneficiary did not include in her income tax return any portion of the income received from the trust. A deficiency against the trustees was assessed by the Commissioner and was paid from income of the trust after collection from the beneficiary had been barred by the statute of limitations. The Supreme Court subsequently determined in another case that the income was taxable to the beneficiary and not to the trustees. the trustees in the *Stone* case brought suit to recover the tax erroneously collected. The Commissioner interposed the defense, sustained by the Supreme Court, that the tax which should have been paid by the beneficiary exceeded that paid by the trustees, and that, as any recovery would inure to the advantage of the beneficiary, the Commissioner could set off the debt due from her. After a discussion of the basic principles involved, the Supreme Court said:

"Equitable conceptions of justice compel the conclusion that the retention of the tax money would not result in any unjust enrichment of the government. All agree that a tax on the income should be paid, and that if the trustees are permitted to recover no one will pay it. It is in the public interest that no one should be permitted to avoid his just share of the tax burden except by positive command of law, which is lacking here. No injustice is done to the trustees or the beneficiary by withholding from the trustees money which in equity is the beneficiary's, and which the government received in payment of a tax which was hers to pay. A single error on the part of the taxing authorities, excusable in view of persistent judicial declarations, has caused both the underassessment of one taxpayer and the overassessment of the other. But the error has not increased the tax burden of either, for whether the tax is paid by one or the other, its source is the fund which should pay the tax, and only the equitable owner of the fund is ultimately burden-

ed. * * * " 301 U.S. 537–538, 57 S.Ct. 854.

See also Bull v. United States, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 299, 67 S.Ct. 271, 91 L.Ed. 296 (1946).

The Fourth Circuit has applied the principle enunciated in Stone v. White both for and against the government. Compton v. United States, 4 Cir., 334 F.2d 212, 216 (1964); United States v. Herring, 4 Cir., 240 F.2d 225 (1957); Western Maryland Railway Company v. United States, D.Md., 131 F.Supp. 873, 889 (1955), aff'd per curiam, 4 Cir., 227 F.2d 576 (1955), cert. den. 351 U.S. 907, 76 S.Ct. 696, 100 L.Ed. 1443 (1956).

Plaintiffs contend that Stone v. White is distinguishable because in that case the deficiency assessment was satisfied out of current income, while in the present case the income for the years in question had been distributed to Eugene, the beneficiary, and the deficiency had to be satisfied from another source. The record does not show what the other source was; presumably it was paid from or borrowed on the credit of the assets of the Trust, and repaid out of the income of later years. That distinction does not require a different result in this case. Eugene was and is the sole life beneficiary of the Trust, and received the income from the Trust which was reported as capital gain rather than as ordinary income. Any recovery herein by the Trust would inure to his benefit. If the government cannot recoup the tax monies against the Trust, no one will pay the tax.

█ This Court concludes that the doctrine of equitable recoupment prevents recovery by the Trustee in this case of any amount which should properly have been assessed against and paid by Eugene.

### 3

Was the basis of the second trust notes properly determined?

When the Trust was established in 1931, it had among its assets a note of

Smith, Inc., in the amount of $163,000, which was secured by eleven notes of $25,000 each, issued under a second deed of trust on the Conard Apartment. In 1938, Ernest, as Trustee, purchased the collateral security for $100,000 by allowing a credit in that amount against the $163,000 note. The balance of $63,000 was treated as uncollectible and was written off as a bad debt by the trustee and deducted from the fiduciary income tax return filed in 1938. By reason of other deductions, the tax benefit of the loss to the Trust was only $2,505.71. The tax benefit of the loss to Ernest individually was $12,122.47.

Taxpayers contend that in their returns for the years 1953 and 1954, as well as in previous years, they erroneously used as the cost basis of the notes the amount of $100,000 instead of $148,371.82. The latter amount represents the cost of the notes plus that portion of the $63,000 loss from which taxpayers claim to have received no benefit in 1938. They rely upon sec. 111 of the 1954 Code, and sec. 22(b) (12) of the 1939 Code, as amended.[5] Those sections do not support taxpayers' position. They have been interpreted by the courts to require such an interrelationship between the event which constitutes the loss and the event which constitutes the recovery that they can be considered parts of the same transaction. Smyth v. Sullivan, 9 Cir., 227 F.2d 12, 14 (1955); Sloane v. Commissioner of Internal Revenue, 6 Cir., 188 F.2d 254, 262, 29 A.L.R.2d 580 (1951).

Nor does Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 64 S. Ct. 239, 88 L.Ed. 248 (1943), relied on by taxpayers, support their contention. In Sloane v. Commissioner of Internal Revenue, the Sixth Circuit said:

"In the Dobson case, the Supreme Court made it clear that it was 'not adopting any rule of tax benefits', but was holding only that 'no statute or regulation having the force of one and no principle of law compels the Tax Court to find taxable income in a transaction where as matter of fact it found no economic gain and no use of the transaction to gain tax benefit.' 320 U.S. 506, 64 S.Ct. 249, 88 L.Ed. 248. Here, the tax court pointed out that one certain requirement for invoking the tax benefit rule is that there be such an interrelationship between the event which constitutes the loss and the event which constitutes the recovery that they can be considered as parts of one and the same transaction. The tax court stated that in all cases cited by the petitioner as authority for applying the concept that where there is no economic gain there is no taxable income, the factual situations revealed a close integration of events producing the loss and the gain; and that in each instance the property on which the loss was suffered could be traced into the transaction producing the gain. The court was unable to find such interrelationship between the steps which resulted in losses to the petitioner and the events which produced the gain in question as to permit them to be considered one and the same transaction." 188 F.2d at 262–263.

Smyth v. Sullivan, supra, relied upon by the taxpayers, is clearly distinguishable. In that case, the taxpayer-executor of an estate held certain real proper-

5. Internal Revenue Code of 1954:
  "§ 111. Recovery of bad debts, prior taxes, and delinquency amounts
  "(a) *General rule.*—Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recov-ery exclusion with respect to such debt, tax, or amount.
  * * *" (26 U.S.C. 1958 ed., sec. 111)
  [Sec. 22(b) (12) of the Internal Revenue Code of 1939 (26 U.S.C. 1952 ed., sec. 22), effective for the year 1953, is substantially similar to sec. 111(a) of the 1954 Code, supra.]

ty which he obtained in 1938. The estate at that time had an appraised value which was smaller than its liabilities. Rather than sell the property, the trustee held it until 1946 when it was sold for an amount in excess of the estate's liabilities. During the seven years the executor held the property he deducted carrying charges from which he obtained no tax benefit. The Court held that he could exclude from gross income in 1946 the carrying charges deducted in prior years without tax benefit, because, according to the Court, the administration of the property until its sale was a single integrated transaction.

The instant case is similar to Allen v. Trust Co. of Georgia, 5 Cir., 180 F.2d 527 (1950), cert. den., 340 U.S. 814, 71 S.Ct. 43, 95 L.Ed. 598, where the taxpayer in 1932 accepted stock in satisfaction of a bad debt, but only a portion of the loss on the debt resulted in a tax benefit. The Court of Appeals held that he could not exclude from gross income in 1940 a portion of the gain on the sale of stock in that year on the theory that such sale was a recovery of the loss suffered in 1932, since the debt was no longer in existence in 1940 and the sale of stock was a separate transaction.

Similarly, in Waynesboro Knitting Co. v. Commissioner of Internal Revenue, 3 Cir., 225 F.2d 477 (1955), the taxpayer in 1931 settled a claim against one of its officers, who had embezzled $488,010.60, by accepting in exchange assets having a fair market value of $258,031.46. The $229,979.14 difference was written off as a loss by the taxpayer; although not all of the loss resulted in a tax benefit. In 1948 the taxpayer received taxable income of $22,500.22 from an asset received from the officer which had a value in 1931 of only $455.20. The taxpayer sought to apply sec. 22(b) (12) to the gain. The Court stated:

"The tax court decided that the receipt of the $22,500.22 was not attributable to a bad debt recovery, and so the tax benefit rule was not applicable. It was pointed out by the tax court that ' * * * the tax benefit rule may be invoked only where there is a recovery which is directly attributable to a previous loss which produced no tax benefit. As stated in Merton E. Farr, 1948, 11 T.C. 552, affirmed sub nom., Sloane v. Commissioner [of Internal Revenue], 6 Cir., 1951, 188 F.2d 254 [29 A.L.R.2d 580], "one certain requirement for invoking it is that there be such an interrelationship between the event which constitutes the loss and the event which constitutes the recovery that they can be considered as parts of one and the same transaction." The requirement that there be an "integrated transaction" was made clear by the Supreme Court in Dobson v. Commissioner [of Internal Revenue], supra * * * and followed in Allen v. Trust Co. of Georgia, 5 Cir., 1950, 180 F.2d 527, certiorari denied (1950), 340 U.S. 814 [71 S.Ct. 43, 95 L.Ed. 598], a case whose facts are similar to those here involved.' 23 T.C. 404.

"The tax court found that the 1931 transfer of the officer's assets and the extinguishment of his obligations to the taxpayer constituted a closed and completed transaction and that thereafter the assets were not interrelated with the officer's obligations which had been extinguished. As stated by the tax court, the transfer of the assets was the total termination of the debt, and the beginning of a new and separate transaction. The assets so acquired had their own independent basis for future gain or loss, which was the fair market value on the date of acquisition. * * * *" 225 F.2d at 480.

■ In the instant case, the Trustee in 1938 purchased for $100,000 the $275,000 second trust notes on the Conard Apartment which were the collateral securing the $163,000 note of Smith, Inc. The cost value of the second trust notes ($100,000) was credited to Smith, Inc.'s obligation on its note for $163,000. The

remainder of $63,000 was treated as worthless by the Trustee and was deducted as a bad debt in that year. The purchase of the collateral was the beginning of a new and separate transaction. There was no such interrelationship between the event which constituted the loss (the treating of the $63,000 balance of the Smith note as worthless) and the event which is claimed to constitute the recovery (the collection of the $275,000 second trust notes) that they can be considered parts of the same transaction.

The basis of the second trust notes was properly reported and determined.

\*

The Court will enter judgments in favor of the defendant.